THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES *et al.*, Plaintiffs-Appellees, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME), AFL-CIO, Defendant-Appellant.

Fourth District   Nos. 4—89—0596, 4—89—0597 cons.

Opinion filed May 1, 1990.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Willilam D. Frazier, Assistant Attorney General, of Chicago, and Gene A. Vernon and Morris Davis, Special Assistant Attorneys General, of Springfield, of counsel), for appellees.

JUSTICE GREEN delivered the opinion of the court:

In two consolidated appeals, defendant American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO, appeals from judgments of the circuit court of Sangamon County entered July 6, 1989, in favor of plaintiffs, the Illinois Department of Central Management Services (CMS) and the Illinois Department of Corrections (DOC), setting aside certain arbitration awards in favor of certain DOC employees represented by AFSCME. These arbitration awards had set aside discharges of those employees and lessened sanctions previously imposed by CMS.

Under the terms of a collective-bargaining agreement between the parties, the employees had a right to submit the discharges to arbitration and did so. Plaintiffs filed applications to vacate the awards in the circuit court of Sangamon County on May 11, 1987, and January 13, 1988, pursuant to section 8 of the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 1608). That court held the awards were contrary to public policy and entered the order from which appeal is taken.

On review in this court, AFSCME maintains (1) the Illinois State Labor Relations Board (Board), rather than the circuit court, has exclusive jurisdiction over challenges to arbitration awards issued under collective-bargaining agreements subject to the Act *where, as here, the challenge* to the award *is that it violates public policy*; and (2) the awards here did not violate public policy.

The question of jurisdiction is complicated and must be considered first. The facts of the case can best be considered together with the question of whether the awards, or any of them, did violate public policy. Accordingly, we defer discussion of the facts at this point and proceed with the question of jurisdiction.

AFSCME does not dispute that under the Act, as distinguished from the Illinois Educational Labor Relations Act (IELRA) (Ill. Rev. Stat. 1987, ch. 48, par. 1701 *et seq.*), the circuit court does have some

power to review awards arising out of arbitration provided for in collective-bargaining agreements. Rather, it contends that the decision in *Board of Education of Community School District No. 1 v. Compton* (1988), 123 Ill. 2d 216, 526 N.E.2d 149, sets forth a doctrine whereby the power to determine whether arbitration awards, such as those here, are contrary to public policy is vested exclusively in the Board pursuant to section 5(a) of the Act. Ill. Rev. Stat. 1987, ch. 48, par. 1605(a).

Section 8 of the Act provides that the "grievance and arbitration provisions of any collective bargaining agreement shall be subject to the Illinois 'Uniform Arbitration Act' " (UAA) (Ill. Rev. Stat. 1987, ch. 10, par. 101 *et seq.*). (Ill. Rev. Stat. 1987, ch. 48, par. 1608.) Section 12(a) of the UAA instructs the circuit court to vacate an arbitration award under certain circumstances, none of which are applicable here. (Ill. Rev. Stat. 1987, ch. 10, par. 112(a).) Subsection (e) of section 12 of the UAA further provides as follows:

"Nothing in this Section or any other Section of this Act shall apply to the vacating, modifying, or correcting of any award entered as a result of an arbitration agreement which is a part of or pursuant to a collective bargaining agreement; and the *grounds for vacating,* modifying, or correcting such *an award shall be those which existed prior to the enactment of this Act.*" (Emphasis added.) Ill. Rev. Stat. 1987, ch. 10, par. 112(e).

In *Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600* (1979), 74 Ill. 2d 412, 386 N.E.2d 47, the supreme court upheld a circuit court decision voiding an arbitration award rendered pursuant to procedures contained in a collective-bargaining agreement, because the award required an employer to perform an act contrary to public policy. The award required the employer to give extra work to teachers who had engaged in an illegal strike. The supreme court concluded the award "drew its essence from the collective bargaining agreement," but it was necessary to vacate the award "as being repugnant to public policy." (*Cook County College Teachers Union,* 74 Ill. 2d at 423, 426, 386 N.E.2d at 52, 53.) That court noted that, under section 12(e) of the UAA, the grounds for modification of awards arising from collective-bargaining agreements were not those stated in the UAA. Accordingly, the opinion makes clear that the public policy issue upon which that case was decided was grounds for vacation of arbitration awards which existed at common law before the enactment of the UAA.

The *Cook County College Teachers Union* case was decided before

the enactment of the Act and the IELRA, which together govern labor relations between State educational and local governmental employers and their employees. Those acts admittedly made drastic changes in those relationships. In *Compton*, the court held that, under the IELRA, where that legislation made no reference to the UAA, the General Assembly intended that circuit courts have no jurisdiction to review awards made pursuant to collective-bargaining agreements under that Act. Although recognizing that circuit court review under the limited scope set forth in the UAA, or even under the common law, would be permissible here, AFSCME maintains the broad scope of the *Compton* decision would vest the Board with the responsibility of determining the public policy issue in this case.

First, AFSCME notes that, in *Compton* and *Board of Education of Warren Township High School District 121 v. Warren Township High School Federation of Teachers, Local 504* (1989), 128 Ill. 2d 155, 538 N.E.2d 524, the supreme court indicated the legislature intended to place primary jurisdiction over arbitration disputes with IELRB. However, the reference in the Act to direct review in the circuit court under the UAA clearly shows a different primary jurisdiction under the Act than under the IELRA.

AFSCME also makes reference to the general policy of limiting the number of jurisdictions which pass upon matters of labor arbitration in order to avoid a multiplicity of interpretation. Here, again, the Act differs from the IELRA not only in the provision for the UAA review of awards, but also in the provision in section 11(e) of the Act, whereby judicial review of a Board order is to be obtained in the appellate court of the district where the aggrieved party resides. Under section 16(e) of the IELRA (Ill. Rev. Stat. 1987, ch. 48, par. 1716(e)), such judicial review is obtainable only in the appellate court for districts in which an IELRB office is located. At present, such review is obtainable only in the first and fourth districts. Nothing in the foregoing matters called to our attention by AFSCME convinces us the legislature did not intend for the circuit court, in giving it limited review of arbitration awards, to rule on the question of whether an award violates public policy.

AFSCME argues that similarities between the Act and the IELRA indicate an intention for the jurisdiction of the circuit court in reviewing arbitration awards to be very limited. These similarities are stated to be: (1) both acts bypass the circuit court to place judicial review of the decisions of the labor relations boards in the appellate court; (2) each act states a purpose of regulating public labor relations and resolving disputes under collective-bargaining agreements (Ill.

Rev. Stat. 1987, ch. 48, par. 1602 (the Act); ch. 48, par. 1701 (IELRA)); (3) the strong public policy in both acts favoring arbitration awards and their enforcement (*American Federation of State, County & Municipal Employees v. Illinois Department of Mental Health* (1988), 124 Ill. 2d 246, 529 N.E.2d 534; *Compton,* 123 Ill. 2d 216, 526 N.E.2d 149); (4) both acts define, to some extent, the subjects of bargaining which are mandatory and those that are permissive (Ill. Rev. Stat. 1987, ch. 48, pars. 1604 through 1607 (the Act); ch. 48, pars. 1704 through 1710(a) (IELRA)); (5) each act contains a provision giving it preference over other law (Ill. Rev. Stat. 1987, ch. 48, par. 1615 (the Act); ch. 48, par. 1717 (IELRA)); and (6) each act has many similar provisions concerning what constitutes an unfair labor practice. Sections 14(a)(8) and (b)(6) of the IELRA (Ill. Rev. Stat. 1987, ch. 48, pars. 1714(a)(8), (b)(6)) make refusal to abide by an arbitration award an unfair labor practice for employers and employee representatives, respectively. The Act has no similar provision, but, by analogy to the National Labor Relations Act (29 U.S.C. §158 (1982)), the refusal to abide by such an award can be treated as an unfair labor practice pursuant to sections 10(a)(1) and (a)(4) of the Act. Ill. Rev. Stat. 1987, ch. 48, pars. 1610(a)(1), (a)(4).

■ We do not find the contentions of AFSCME to be of sufficient weight to overcome the express differences between the Act, where judicial review of arbitration awards is expressly provided for, and the IELRA, where no such power is expressly conferred. We recognize the limited scope of review that is available but see no reason why that limited scope of review does not include the question of whether the award is violative of public policy. Section 8 of the Act makes the UAA applicable for review of the instant arbitrators' awards. As the award arises from the provisions of a collective-bargaining agreement, section 12(e) of the UAA makes the common law grounds for vacation of awards the test we must apply, and a violation of public policy is one of those grounds.

We find support for our position from the opinion in *Illinois Department of Mental Health.* There, AFSCME members were discharged by the Department of Mental Health (Department) for neglect of duties which was causally connected with the death of a patient of a mental institution. The discharges were submitted to arbitration pursuant to a collective-bargaining agreement reached under the Act. The arbitrator reduced the sanction. AFSCME then sought enforcement in the circuit court, and the Department counterclaimed to obtain vacation of the award partially on grounds it violated public policy. The supreme court affirmed an appellate court ruling reversing

the circuit court's judgment setting aside the award. The question of whether the circuit court could, in a proper case, set aside such an award on grounds of a public policy violation was not discussed in the appellate opinion. *American Federation of State, County & Municipal Employees v. State* (1987), 158 Ill. App. 3d 584, 511 N.E.2d 749, *aff'd* (1988), 124 Ill. 2d 246, 529 N.E.2d 534.

■ The supreme court in *Illinois Department of Mental Health* fully discussed the question of whether the award was, in fact, a violation of public policy and held it was not, citing *Cook County College Teachers Union*. The supreme court stated, "An arbitration award in contravention of paramount considerations of public policy is not enforceable." (*Illinois Department of Mental Health*, 124 Ill. 2d at 260, 529 N.E.2d at 540.) While the court did not say who should initially pass on the question of whether the award violated public policy, we think the court would have so stated, had it deemed the circuit court was not the proper tribunal to pass upon the matter initially.

In *City of De Kalb v. International Association of Fire Fighters, Local 1236* (1989), 182 Ill. App. 3d 367, 538 N.E.2d 867, the Appellate Court for the Second District interpreted *Illinois Department of Mental Health*, as we have, to mean that, if an arbitration award arising from a collective-bargaining agreement subject to the Act violates public policy, the circuit court, reviewing the award under the UAA, has the power to vacate the award on that ground. There, the award was held to violate public policy because it violated a statute providing for uniform pension benefits to Illinois fire fighters. That court concluded, as we have, that public policy violations could be considered under section 12(e) of UAA as a common law ground for setting aside an arbitration award.

We now turn to the merits of the cases. Appeal No. 4—89—0596 concerns the discharge of Debra Santel, who was a correctional officer at the DOC facility at Centralia. In the following paragraphs we describe the facts concerning the circumstances of her discharge as found by the arbitrator.

In 1985, Santel began using illicit drugs for recreation and purchased them through social friends. She took those drugs at parties where other officers were doing the same. In January and February 1986, a former inmate named Norris contacted her and asked her to come to Chicago to obtain some "free drugs." She initially refused but acquiesced in late May 1986, when she met him in Chicago. During that weekend, she used both cocaine and alcohol in excess and ended up "hitting bottom." Following this weekend experience, Santel sought help from a personal friend. She subsequently enrolled in a

treatment center for drug abuse and obtained a leave of absence from her job after telling the warden of her problem. After returning to work on July 14, 1986, the former inmate again contacted her, but she requested that he stop calling her because she had gone through drug treatment and was attempting to change her life-style. She did not report any of these contacts to prison officials.

Subsequently, in October 1986, an inmate named Campbell offered Santel substantial money to smuggle an ounce of cocaine into the prison. She testified before the arbitrator that she never agreed to this proposition and never called that person back. An investigator testified that an inmate had told him that Santel was regularly supplying him with drugs at this time. The arbitrator disbelieved this hearsay, as he was fully entitled to do. The investigator further testified he instructed the inmate to get Santel to bring drugs into the facility. The investigator obtained a court order to wiretap a telephone conversation with Santel in which he would purport to arrange drug transactions. Transcripts of two phone calls are recited in the arbitrator's decision.

The transcript of a phone call from the investigator to Santel on October 29, 1986, showed the investigator told Santel Campbell had told him, he, the investigator, was supposed to drop off a package to her and she responded she had "changed [her] mind." On October 31, 1986, a call to Santel was made by another person who asked what had happened "yesterday," and Santel responded she had changed her mind. The following colloquy then took place:

"Q. Have you? Or do you still want to do it or what?

A. I don't know um, how much?

Q. Well, well first of all what did you uh, what did you and Jim talk about, didn't you uh, figure all that stuff out?

A. He told me but ***

Q. What did he say?

A. *** I don't feel like it's worth it for that.

Q. What did he say?

A. Five.

Q. Five Hundred?

A. Grand.

Q. What do you mean?

A. Thousand.

Q. He said he'd give you five thousand to smuggle in one ounce?

A. Uh huh.

Q. No, we were talkin' more like 400 dollars.

A. Well huh, absolutely I don't want to.

Q. That's just for one ounce to go in, right? What, what kind of deal did he have set up with ya, I don't know why everything's getting, you know, so confused and screwed up here.

A. Well I am not familiar with the stuff, you know.

Q. What, coke?

A. No just um, the, you know, movin' it.

Q. Movin' it in? Oh, you've never done it before?

A. Huh uh.

Q. Oh.

A. So.

Q. We were under the impression that you had.

A. No, huh uh. That's the reason I told 'em I'd changed my mind.

Q. So you don't want to do it at all now then?

A. No.

Q. Okay. Okay.

A. Alright?

Q. Yeah, thanks anyway.

A. Uh huh, bye.

Q. Bye."

The arbitrator rejected the foregoing as proving Santel had been willing to engage in an illegal drug transaction and then changed her mind. According to the arbitrator, Santel testified on October 31, 1986, she had received a call which awakened her, and she spoke as she did in order to get the caller off the phone. She maintained she had consistently attempted to avoid contacts with people who were trying to get her to deal in drugs. The arbitrator admitted the transcript contained "damning evidence she didn't carry drugs because the price was not right," but that, in any event, no evidence was produced of an act in furtherance of that intent which would have been necessary for her conduct to constitute a crime. The warden had apparently testified he did not think Santel intended to deal in drugs.

The arbitrator determined Santel was guilty of (1) failing to report the Norris contact; (2) using drugs with fellow officers and not reporting it; (3) travelling to Chicago to use drugs with an ex-inmate, Norris, and not reporting it; (4) failing to report contacts by Norris following her release from treatment; (5) failing to report the contact by the inmate when he solicited her; and (6) failing to report the telephone conversation shown in the transcripts. The arbitrator concluded discharge would have been justified if it were not for extenuating circumstances, including: (1) once she had undergone rehabilitation, she

refused to use or deal in drugs; (2) she had been sincere and faithful in treatment; (3) she gave incriminating evidence when confronted by an investigator; and (4) she produced evidence incriminating other officers. The arbitrator proceeded with criticism of the procedure whereby he assumed the warden must have used some information he had obtained from Santel when she went into the rehabilitation program in order to obtain the court order for the wiretap.

The arbitrator deemed a "last chance" approach to discipline was appropriate. Therefore, he set aside the discharge and ordered Santel to (1) undergo a drug test before resuming employment; (2) be subject to spot drug testing for the next two years; and (3) be assigned to another job or another prison if necessary to protect her after the information she had given. The arbitrator also ordered an award of back pay on her behalf.

Appeal No. 4—89—0597 concerns the discharges of David Kleinschmidt, Robert Heller, Perri Mehring, and Michael Lutz, who were correctional officers at the DOC facility at Menard and assigned to the segregation unit. According to the arbitrator's decision, on July 22, 1986, a violent inmate named Richardson threw milk on Heller, whereupon, pursuant to regulations, many of Richardson's personal effects were taken from his cell. Later that day, Richardson threw food at another officer and, again pursuant to regulation, the remaining items were removed from his cell. Lutz, Mehring, and Heller then took Richardson to another room for the purpose of reasoning with him to impress upon him that he should cease his attacks on officers. At that time, Richardson, who was handcuffed and in leg irons, rose up several times. Lutz attempted to guide Richardson back into his chair, and, when Richardson rose for the third time, Mehring hit Richardson in Richardson's right arm and stomach with his fist. Then Lutz struck Richardson in the head and eye, whereupon Mehring shouted, "that's enough," and the scuffling ceased. Kleinschmidt entered the room prior to the time the officers hit Richardson and witnessed those acts. None of the officers reported the incident until Mehring admitted it later. All had denied the incident to higher authorities.

Personnel records introduced into evidence showed the job performance of Mehring and Lutz had been rated as satisfactory, while the records for Kleinschmidt and Heller indicated they needed to use their time to better advantage but their performance was otherwise satisfactory. Heller and Kleinschmidt were discharged for failing to report an incident and conduct unbecoming an officer in violation of DOC rules. Mehring and Lutz were discharged for using excessive

force and failing to report the incident. The arbitrator found no just cause existed to discharge Kleinschmidt and Heller based on their failure to report and determined a "fifteen day suspension *** more typically represent[ed] an appropriate disciplinary level." The arbitrator found the battery of Richardson was "totally unnecessary" and constituted the use of "excessive force," but deemed the blows were provoked, not premeditated, and resulted from spontaneous anger. The arbitrator characterized the blows as not involving "corporal punishment" or "inmate abuse." The arbitrator reduced the punishment of Mehring and Lutz to 60-day suspensions and reinstated them.

■■ ■ In each case, we must decide whether the arbitrator's action in setting aside the discharges was contrary to public policy. The *Illinois Department of Mental Health* opinion points out the often stated rule that public policy "is to be found in the Constitution, in statutes and, when these are silent, in judicial decisions." (*Illinois Department of Mental Health*, 124 Ill. 2d at 260, 529 N.E.2d at 540.) Then quoting from *Zeigler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 193, 91 N.E. 1041, 1046, which quoted from *Hartford Fire Insurance Co. v. Chicago, M. & St. P. Ry. Co.* (1895), 70 F. 201, 202, the *Illinois Department of Mental Health* court explained that public policy is not determined merely by what might be thought to be the best interests of the public. Similar explanation is found in *W.R. Grace & Co. v. Local Union 759* (1983), 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183. The supreme court further cautioned that the public policy exception which permits vacation of arbitration awards arising from collective-bargaining agreements is an "extremely narrow" concept. *Illinois Department of Mental Health*, 124 Ill. 2d at 261, 529 N.E.2d at 540.

The *Illinois Department of Mental Health* opinion mentioned that Federal cases on the public policy issue are not binding because they involve different legislation than the Act, but we can take guidance from them. One such cited case is *United States Postal Service v. American Postal Workers Union* (1st Cir. 1984), 736 F.2d 822. There, an arbitrator, acting pursuant to a collective-bargaining agreement, set aside a discharge of a Federal postal worker whose employment had been terminated after he had been convicted of embezzling $4,325 he had obtained while performing his duties in regard to issuing and cashing postal money orders. The arbitrator relied upon the employee's intent to repay the money he had confiscated, the fact the employee had done so in regard to other funds he had embezzled, and the employee's good prior work record. In upholding a district court judgment setting aside the arbitrator's decision, the court of appeals

noted the public policy involved was well-defined by law and common sense. The court reasoned that to uphold the award would likely indicate to other employees their dishonesty would also be dealt with lightly. The court indicated not all arbitrators' awards setting aside discharges for law violations would be contrary to public policy. However, that court indicated the severe breach of fiduciary duty by that employee required termination as a matter of public policy.

When the use of intoxicants is at the heart of conduct giving rise to a discharge, Federal courts have not been consistent in determining whether an arbitrator's action in overturning the discharge is contrary to public policy. In *Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO, Local Union 540 v. Great Western Food Co.* (5th Cir. 1983), 712 F.2d 122, an arbitration award, requiring an employer to reinstate a truck driver who had gotten into a collision after he had been drinking intoxicants, was held to violate public policy. The opinion noted that a police officer had cited the driver for "drinking intoxicating liquor while on duty or within 4 hours prior," which was apparently a violation of Federal Motor Carrier Safety Regulations (49 C.F.R. §385.1 *et seq.* (1989)). (*Amalgamated Meat Cutters*, 712 F.2d at 125.) The public policy of preventing people from drinking and driving was deemed to require setting aside the arbitrator's award.

A different decision was reached in *Northwest Airlines, Inc. v. Air Line Pilots Association, International* (D.C. Cir. 1987), 808 F.2d 76, *cert. denied* (1988), 486 U.S. 1014, 100 L. Ed. 2d 213, 108 S. Ct. 1751. There, a pilot had consumed liquor within 24 hours of a flight and, on a stopover, was found to have a blood-alcohol content of .13%, far in excess of Federal Aeronautic Administration regulations for airline crews. His employer discharged him. An arbitration board set aside the discharge and ordered the pilot, who had a recognized alcohol problem, reinstated without back pay as soon as the Federal Air Surgeon certified he met Federal regulatory standards for flying commercial aircrafts. The court of appeals upheld the arbitrator's decision. It concluded no public policy of protecting the public was violated because the pilot would not be reinstated until he was again fit to fly.

In *Illinois Department of Mental Health*, no law violation had occurred. Rather, at a time when a State mental health facility was short-staffed, two employees were authorized to go to a grocery store to obtain food for a party for residents. The employees performed that task but then deviated from their instructions and made an unauthorized trip to a flea market. They were away from work for an ad-

ditional hour and fifteen minutes, during which time a resident, who had been left unattended and tied to a toilet seat, died. The opinion does not indicate the two employees had left the resident in the precarious unattended situation which surrounded the death, and the record did show they otherwise had exemplary records. The court noted particularly that the employees' conduct did not involve abuse directed toward any resident. Thus, the public policy grounds there were weaker than as to any of the employees here, and the rejection of the public policy grounds for vacating the award there does not require rejection here.

■ The situation in regard to DOC employees Mehring and Lutz in case No. 4—89—0597 is clearest. It is undisputed they took Richardson to a separate room to explain to him that he must discontinue his attacks on officers. Richardson was certainly a most provoking prisoner. No doubt in the past, many jailers and prison guards believed the only way to handle such a prisoner was by beating him to teach him a lesson, but modern penology rejects this method, and it is contrary to prison regulations. Correctional officers are constantly put in a position where they are tempted to respond as here. However, the arbitrator found the hitting of this person was unjustified and was, thus, a battery. A clear public policy exists under the law not to batter prisoners. While the battery of the prisoner here was not severe enough to constitute a violation of his limited constitutional right of liberty (see *Sampley v. Ruettgers* (10th Cir. 1983), 704 F.2d 491), even the slight battery which occurred here can have an inflammatory effect in a prison setting. Public policy demands that prison authorities have the power to discharge those engaging in such activity.

The situation of Santel also bears upon the explosive situation prevalent in prisons. We need cite no authority to show that drugs present a horrendous problem in this country and that the problem is particularly acute in penal institutions. However, we must give deference to the arbitrator's determination Santel committed no crime at the time she was under investigation in the fall of 1986. Indeed, even if we could conclude she was speaking accurately in her wiretapped telephone conversation when she indicated she decided not to bring drugs into the prison because the price was not right, that evidence would not prove the commission of a crime by her, because no overt act in support of any agreement to bring in drugs was shown. Thus, if the discharge concerned only the situation in the fall of 1986 when Santel was being investigated, we would be deciding whether setting aside a discharge of a correctional officer who was shown to be likely to be unreliable and had failed to make various reports was a viola-

tion of public policy. We are unable to find any support in the constitution, laws, or court decisions to support such a ruling.

■ However, here the misconduct involved goes back to February 1986 when Santel used illegal drugs with an ex-inmate in violation of regulations prohibiting socialization with such a person. The laws against the use of such drugs create the public policy which was violated here. We can then consider that illegal conduct within the context of the duty imposed upon persons in the sensitive position of a corrections officer. Under the circumstances, we hold the overturning of Santel's discharge to be contrary to public policy.

We recognize the arbitrator gave thorough consideration to the Santel situation, made every effort to be fair, and entered an order which contained many provisions for the protection of the public. Nevertheless, when employees in sensitive positions commit such serious offenses as violating drug laws, public policy requires the employer to have the ability to discharge them.

■ As we have suggested, the mere violation of regulations requiring the reporting of misconduct by other employees, however serious, has an insufficient nexus to any public policy expressed in the constitution, laws, or court decisions to require employers to have a right to discharge for said conduct. Accordingly, we hold the order setting aside the discharge of Heller and Kleinschmidt was not against public policy.

Accordingly, in case No. 4—89—0596 we affirm the circuit court. In case No. 4—89—0597 we affirm that portion of the judgment vacating the arbitration awards as to Mehring and Lutz, but reverse that portion of the judgment vacating the arbitration awards as to Kleinschmidt and Heller. Pursuant to our power under Supreme Court Rule 366(a)(5) (107 Ill. 2d R. 366(a)(5)), we enter judgment in favor of Kleinschmidt and Heller and against CMS and DOC, confirming the arbitration awards as to them.

Affirmed in part; reversed in part and judgment entered.

KNECHT, P.J., and STEIGMANN, J., concur.