BOARD OF EDUCATION OF SCHOOL DISTRICT U-46, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—90—0739

Opinion filed July 25, 1991.

Fay Hartog-Rapp and Gerald D. Skoning, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Michael H. Slutsky, of Cotton, Watt, Jones & King, of Chicago, for respondent District U-46 Transportation Union, IEA-NEA.

Melinda L. Selbee, of Illinois Association of School Boards, of Lombard, for *amicus curiae* Illinois Association of School Boards.

JUSTICE McCULLOUGH delivered the opinion of the court:

Cindy Wortham (grievant) was terminated in May 1988 by the Board of Education of School District U-46 (District) from her position as a school bus driver. This termination was challenged by the

District U-46 Transportation Union (Union) and in July 1989 an arbitrator determined Wortham should be reinstated, without loss of seniority, but with no back pay. (*District U-46 Transportation Union and Elgin School District No. 46* (July 20, 1989), AAA 51—390—0434—88—S (McAllister, Arb.).) The District refused to comply with the arbitrator's award believing it was contrary to public policy. The hearing officer for the Illinois Educational Labor Relations Board (Board) found the District had committed unfair labor practices in refusing to comply with the terms of the arbitrator's award (*Board of Education School District U-46*, 6 Pub. Employee Rep. (Ill.) par. 1085, No. 90—CA—0020—C (Illinois Educational Labor Relations Board, Hearing Officer's Recommended Decision and Order, June 1, 1990)) and the Board affirmed the hearing officer and adopted his decision and order (*Board of Education of School District U-46*, 6 Pub. Employee Rep. (Ill.) par. 1138, No. 90—CA—0020—C (Illinois Educational Labor Relations Board, Nov. 5, 1990)). The District appeals. (Ill. Rev. Stat. 1989, ch. 48, par. 1716.) We reverse, as we hold the arbitrator's award reinstating the grievant violated public policy; so the failure to comply with it does not give rise to unfair labor practices.

The grievant was hired by the District in August 1979. During the course of her employment, she has received safety awards from the Secretary of State, but has also been the subject of complaints and disciplinary action about her poor driving habits. The grievant received a 1½-day suspension without pay on April 18, 1988, for an altercation with another bus driver. The arbitrator and the Board found this suspension was issued without just cause and it is not an issue on appeal. On May 2, 1988, grievant was issued a disciplinary suspension pending an investigation by the District over a series of complaints concerning her driving. On May 9, 1988, the grievant was informed of the District's recommendation that she be terminated from employment effective May 3, 1988. Four reasons were given for her dismissal: (1) harassment of others; (2) lying to the director of transportation; (3) inappropriate driving tactics; and (4) unsafe and unlawful driving practices.

The District and the Union have been parties to collective-bargaining agreements since 1974. The present case arose under their agreement covering the period of September 1, 1987, through August 25, 1988 (Agreement). Section 16.1 of the Agreement provided:

> "The Board of Education will not discharge or discipline any employee without just cause and will use a progressive discipline procedure. This, however, will not prevent the Board from taking immediate action for unusual or severe circum-

stances. This procedure does not apply to those who have had their school bus drivers permit revoked by the State of Illinois and it does not cover probationary employees."

Article V of the Agreement provided for a grievance procedure, and section 5.82 of that article stated that the last step of the grievance procedure is final and binding arbitration.

The District relied on seven incidents to discharge the grievant. The arbitrator found the evidence supported only three of those incidents.

### APRIL 7, 1988

The first incident involved the grievant's driving of a high-school track team to a track meet. Two coaches, Scott Witt and Bob Arnett, submitted a written complaint to the District, signed by both of them, alleging the grievant drove at a speed of 40 to 50 miles per hour on side streets on the way to the track meet. This excessive rate of speed caused the students on the bus to raise their arms as if on a roller coaster ride. The complaint further stated the grievant, finding this behavior amusing, placed her head between her legs as she drove and was laughing.

The grievant submitted a written response to this allegation. She asserted that the area in which she was driving required her to build up her speed because of the steep hills. She denied placing her head between her legs while driving and asserted she could not even get into that position if she tried. Furthermore, the grievant claimed she drove the speed limit on the side streets and, while climbing a hill, noticed the students raising their arms. She admitted laughing and responded to the coach's inquiry about the conduct of the students. Finally, the grievant questioned one of the coaches' actions in allowing his small child to return home on the bus thereafter when the coach was so concerned with her driving.

At the hearing, on direct examination, Coach Witt indicated the poor driving occurred on the way back from the track meet. However, on cross-examination, he stated the "roller coaster" incident happened on the way to the track meet. Assistant Coach Jamie Castellano testified he thought the grievant was driving "a little fast considering the way the streets go up and down and curve." Coach Castellano testified he believed the roller coaster incident occurred on the way to the track meet. Coach Arnett testified the grievant placed her head six inches from her knees, at the lower end of the steering wheel, and that there was no way she could be looking at the wind-

shield from that position. He also testified the roller coaster incident happened on the way back from the track meet.

## APRIL 22, 1988

On April 22, 1988, the grievant drove in an erratic behavior and made an abrupt stop as she approached an intersection. She then drove in an erratic manner by speeding up, slowing down, and speeding up again. This complaint came from a written statement of Joan Waterman, another bus driver, who witnessed this incident. A written statement submitted by Jim Shumaker, who was behind the grievant when she came to the abrupt stop, alleged her actions caused him to slam on his brakes and come within five feet of rear-ending her bus.

Joan Waterman testified at the hearing that both the grievant and Shumaker were driving the speed limit (40 miles per hour) before turning onto Willard Street. Waterman testified that after the grievant turned onto Willard Street, three cars turned in between the grievant's bus and the bus driven by Shumaker and two cars were between Shumaker's bus and Waterman's bus. The grievant allegedly drove in a manner where she would speed up and then slow down, which caused the cars and the buses to apply their brakes in a random fashion. Waterman further testified the grievant would check her rearview mirror to see what, if any, effect her driving was having on the cars behind her. Waterman testified the grievant made an abrupt turn onto Willard Street. Waterman also testified the grievant used her right-turn signal to make this turn.

In her written statement, Waterman estimated the grievant's top speed on Willard to be 20 to 30 miles per hour and her low speed to be 10 to 15 miles per hour. She also wrote there were three or four cars between the three buses. Waterman placed Shumaker a bus-length behind the grievant when she made the abrupt stop. In Shumaker's written statement, he estimated the grievant's speed to be 12 to 15 miles per hour on Willard. However, his testimony at the hearing was that the grievant would proceed at 5 to 10 miles per hour, then speed up to 12 to 15 miles per hour, then slow down to 5 to 10 miles per hour. Shumaker further testified the grievant did not use her right-turn signal when turning onto Willard until after the abrupt stop. He estimated he came within three or four feet from hitting grievant's bus.

When asked about this incident at the May 5, 1990, meeting, the grievant did not recall making an abrupt stop at the intersection. She also stated she may have driven at varying speeds as a reaction to the road conditions.

APRIL 29, 1988

The final incident regarding the grievant's driving involved another trip to a track meet on April 29, 1988. The same three coaches that previously complained about the grievant filed another complaint with the District.

Coach Arnett sent a letter to the director of transportation describing the grievant's driving on a trip to Mt. Prospect High School. That letter stated the grievant made an unnecessary left-hand lane change just prior to the tollway entrance, which in turn caused her to have to force her way back into the right lane to exit onto the tollway. A car behind her bus had to slam on its brakes to let the grievant into the right-hand lane. Coach Arnett also alleged the grievant exceeded the speed limit on the tollway. He was driving his own car at approximately 58 to 59 miles per hour and could not catch up with the bus. Finally, Coach Arnett alleged the grievant, after stopping in the left-hand lane at a set of railroad tracks, abruptly swerved into the right-hand lane, causing him to take evasive action to avoid a collision with the bus. Coach Arnett's testimony at the hearing paralleled his allegations in his written statement.

Coach Witt also submitted a written statement regarding the grievant's driving on April 29, 1988. Coach Witt alleged the grievant passed cars on her right-hand side, which caused her to cut them off when she changed lanes. He further alleged she always seemed to be in too much of a hurry. Witt alleged that at one point, rather than making a complete stop at the stop sign, the grievant rolled through a four-way intersection, which caused her to slam on her brakes to avoid broadsiding another car in the intersection. Finally, Witt wrote, in his opinion, "the woman should not be driving a school bus. *** I would not want any of my kids riding with her. She is a time-bomb waiting to go off."

Furthermore, Coach Witt's testimony at the hearing corresponded with the allegations in his written complaint. However, he added the fact that at one point when the grievant was in the left-hand lane with her right-turn signal on, he noticed a car to the bus' right waiting for the bus to change into that lane. Just as the car began to pass the bus, the bus moved into the right-hand lane and almost ran the car off the road. Finally, Coach Witt testified he believed the grievant was speeding on the tollway because, although he could not see the speedometer clearly, he could see the 60 or 65 mark and the needle was past that mark.

Assistant Coach Castellano testified he rode the bus on April 29, 1988. He recalled the grievant speeding that day as well as rolling through the stop sign and barely missing the car in the intersection. Furthermore, he testified that immediately after the grievant rolled through the stop sign, he made a comment out loud to the other coach on the bus. He said, "Whoa, did you see that? She went through the stop sign." Coach Castellano testified Coach Witt told him to remain quiet.

The grievant maintained she made a complete stop at the four-way intersection. She acknowledged having to quickly stop for the car in the intersection, but attempted to explain this by stating the car was in her blind spot. Finally, the grievant generally denied the rest of the allegations of misconduct on that day.

The arbitrator found the testimony concerning grievant's driving on April 5, 1988, and the two incidents on April 18, 1988 (one involving driving), did not prove the grievant improperly operated her bus. The arbitrator concluded the preponderance of the evidence established the grievant did improperly operate her bus on April 7, 22, and 29, 1988, so that the District had good and sufficient reason to be concerned with her driving. However, the District's disciplinary rules and regulations for bus drivers required progressive discipline (written warning, suspension or second warning, termination) for its drivers, and the grievant did not receive this.

The arbitrator rejected the District's assertion that even without considering the April 18 suspension, previous warnings from September and October 1986 served to satisfy the progressive disciplinary policy. The arbitrator found the District's actions to be contrary to this policy because, when the grievant was suspended indefinitely on May 2, two incidents were cited which were known to the District prior to the April 18 suspension but which were previously unknown to the grievant. The arbitrator stated "[s]aving up alleged rule violations without attempting to correct an employee's conduct is the antithesis of progressive discipline." Furthermore, none of the incidents which were supported by substantial evidence alone warranted termination. Therefore, the arbitrator concluded the District's failure to follow the progressive disciplinary policy required a finding of no just cause to terminate the grievant.

The arbitrator acknowledged that students are an "invaluable commodity" and some disciplinary action needed to be taken. (*District U-46 Transportation Union and Elgin School District No. 46* (July 20, 1989), AAA No. 51—390—0434—88—S (McAllister, Arb.) (slip op. at 38).) Specifically, he found any contemplation of back pay

was outweighed by the District's concern for its school children. Noting that the grievant's driving habits needed correction, the arbitrator stated granting no back pay would make the grievant understand that she must in the future be a safety-conscious driver and ignore the hostility and pettiness of her fellow drivers. Finally, the arbitrator criticized the District for its inability to distinguish from petty, biased concerns and legitimate complaints which obscured the basic issue of safety. The arbitrator concluded there was no just cause for termination and that the grievant should be reinstated without back pay. The District was ordered to make the grievant whole for the 1½-day suspension of April 18, 1988, which, as heretofore stated, is not an issue on appeal.

The District, on August 21, 1989, adopted a resolution stating that the reinstatement of the grievant would be contrary to public policy because of her unsafe driving practices. Therefore, the District determined it would not comply with the arbitration award, and it thereafter declined to do so.

On September 26, 1989, the Union filed an unfair labor practice charge against the District alleging its refusal to comply with the arbitration award violated sections 14(a)(1), (a)(5), and (a)(8) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(1), (a)(5), (a)(8)). The Union subsequently withdrew its section 14(a)(5) claim. A hearing was held and on June 1, 1990, the hearing officer issued a recommended decision and order. (*Board of Education School District U-46*, 6 Pub. Employee Rep. (Ill.) par. 1085, No. 90—CA—0020—C (Illinois Educational Labor Relations Board, Hearing Officer's Recommended Decision and Order, June 1, 1990).) He determined that a public policy exception to the enforcement of arbitration awards did apply under the Act. The hearing officer further concluded, however, that in the present case no explicit, well-defined and dominant public policy existed to preclude reinstatement of the grievant. Therefore, the hearing officer found the District violated the Act by not reinstating the grievant.

On September 28, 1990, the Board issued a final order adopting the hearing officer's recommended decision and order. (*Board of Education of School District U-46*, 6 Pub. Employee Rep. (Ill.) par. 1138, No. 90—CA—0020—C (Illinois Educational Labor Relations Board, Nov. 5, 1990).) The District filed this petition for review of the order of the Board on October 26, 1990, pursuant to section 16(a) of the Act. Ill. Rev. Stat. 1989, ch. 48, par. 1716(a).

■ The law is clear in Illinois that where a grievance proceeds to arbitration, the parties must accept the facts as found by the arbitra-

tor. " '[B]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept.' " *American Federation of State, County & Municipal Employees v. State of Illinois* (1988), 124 Ill. 2d 246, 255, 529 N.E.2d 534, 538 (*AFSCME*), quoting *United Paperworkers International Union v. Misco, Inc.* (1987), 484 U.S. 29, 37-38, 98 L. Ed. 2d 286, 299, 108 S. Ct. 364, 370.

A court's review of an arbitrator's award is extremely limited. (*AFSCME*, 124 Ill. 2d at 254, 529 N.E.2d at 537.) Courts may not interfere with the discretionary authority vested in an administrative body unless that authority is exercised in an arbitrary or capricious manner or the administrative decision is contrary to the manifest weight of the evidence. (*Board of Regents of Regency Universities v. Illinois Educational Labor Relations Board* (1990), 202 Ill. App. 3d 559, 560 N.E.2d 627.) A decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in the light most favorable to the administrative agency, the court determines that no rational trier of fact could have agreed with the agency's decision. *Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board* (1987), 153 Ill. App. 3d 744, 505 N.E.2d 418.

As a general rule, courts will accord deference to the interpretation placed on a statute by the agency charged with its administration and enforcement. (*Hardin County Education Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 528 N.E.2d 737.) An administrative agency's interpretation is not binding, however, and it will be rejected when it is erroneous. *Hardin*, 174 Ill. App. 3d at 174, 528 N.E.2d at 740.

A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. (*Misco*, 484 U.S. at 42, 98 L. Ed. 2d at 301, 108 S. Ct. at 373.) The question of public policy is ultimately one for resolution by the courts. If the contract as interpreted by the arbitrator violates some explicit public policy, courts are obliged to refrain from enforcing it. (*W.R. Grace & Co. v. Local Union 759* (1983), 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183.) Such a public policy, however, must be well defined and dominant, and is to be ascertained " 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " (*W.R.*

*Grace & Co.*, 461 U.S. at 766, 76 L. Ed. 2d at 307, 103 S. Ct. at 2183, quoting *Muschany v. United States* (1945), 324 U.S. 49, 66, 89 L. Ed. 744, 756, 65 S. Ct. 442, 451.) The public policy of a State or nation must be determined by its constitution, laws, and judicial decisions—not by the varying opinions of laymen, lawyers, or judges as to the demands of the interests of the public. *AFSCME*, 124 Ill. 2d at 260, 529 N.E.2d at 540.

The District contends there is a public policy in favor of the safe transportation of school children. In support of this assertion, the District relies upon the stringent requirements imposed upon those persons seeking a school bus driver's permit as stated in section 6—106.1 of the Illinois Vehicle Code (Vehicle Code) (Ill. Rev. Stat. 1989, ch. 95½, par. 6—106.1). The District also refers to the Illinois State Board of Education's rules and regulations embodied in its manual entitled "Basic Competencies for School Bus Drivers," as well as those stated in the Illinois Rules of the Road (Rules of the Road) (Ill. Rev. Stat. 1989, ch. 95½, par. 11—100 *et seq.*), which are incorporated by reference into the Board of Education's rules. Finally, the District relies on its own manual, "Professional Driver's Handbook," which expressly requires the bus drivers to "[t]ake necessary safety precautions to protect passengers and/or equipment at all times."

While there is no precise definition of public policy, it is to be found in the Constitution, in statutes, and in judicial decisions. An examination of these three sources leads to the conclusion that there is a public policy favoring the safe transportation of school children.

## I. CONSTITUTION

Article X, section 1, of the Illinois Constitution states a fundamental goal of the people of this State is to provide for the educational development of all persons to the limits of their capabilities. (Ill. Const. 1970, art. X, §1.) The purpose of section 1 of article VIII of the 1870 Constitution (Ill. Const. 1870, art. VIII, §1 (now article X, section 1, of the 1970 Constitution)) was to compel the General Assembly to retain and perpetuate, as a minimum, the system of free schools that had already been developed. (*Hamer v. Board of Education of School District No. 109* (1970), 47 Ill. 2d 480, 265 N.E.2d 616.) This State's policy in favoring a system of free schools began in 1825 when "An Act providing for the Establishment of Free Schools" (1825 Ill. Laws 121) was passed. *Hamer*, 47 Ill. 2d at 487, 265 N.E.2d at 620.

It is unquestionable that a public policy exists in this State favoring the education of children. The primary purpose of the mainte-

nance of the common school system is the promotion of the general intelligence of the people constituting a body politic, and thereby to increase the usefulness and the efficiency of the citizens. (*Lee v. Board of Education, Marshall Township High School District No. 200* (1924), 234 Ill. App. 141.) Clearly, this policy is well defined, explicit, and dominant. Furthermore, although alone it does not establish a public policy favoring the safe transportation of school children, it is an integral part of that public policy.

## II. STATUTES

Several statutes enacted by the legislature indicate there is a public policy favoring the safe transportation of school children. First, section 29—1 of the School Code (Ill. Rev. Stat. 1989, ch. 122, par. 29—1) states that school boards may provide free transportation for their pupils. Furthermore, other sections of the School Code permit such boards to provide for transportation to and from any school-related activities. (Ill. Rev. Stat. 1989, ch. 122, pars. 29—3.1 through 29—3.4.) The legislative determination that school boards may provide transportation for children to school and school-related activities suggests a corollary desire to ensure the students reach their destinations. At the very least, these statutes indicate a public policy favoring the transportation of school children and undoubtedly this would include the safe transportation of those students.

Section 27—26 of the School Code (Ill. Rev. Stat. 1989, ch. 122, par. 27—26) provides the curriculum in all public schools which provide instruction to students in grades kindergarten through 12th shall include instruction in safe bus-riding practices for all children who are transported by bus. This must be done at least twice during the school year and must include emergency evacuation drills. This, too, demonstrates the legislature's desire to ensure safety in the transportation of school children. The students themselves are taught that bus safety is important and surely the conduct of the bus drivers is as important, if not more important, than the conduct of the students riding the bus.

Finally, several sections of the Vehicle Code evince a public policy favoring the safe transportation of school children. The clearest evidence of this public policy is found in section 6—106.1 of the Vehicle Code, which lists the necessary requirements for a school bus driver permit. Among other things, an applicant for such a permit must be at least 21 years old; must pass a written test on school bus operation, school bus safety and special traffic laws relating to school buses; and must submit to a medical examination, which includes test-

ing for drug and alcohol use. An applicant cannot have been convicted of reckless driving, driving while intoxicated, or reckless homicide resulting from the operation of a motor vehicle within three years of the date of application.

School bus driver permits are only valid for one year. A permit can be revoked whenever the Secretary of State has revoked or suspended the holder's driver's license or when the regional superintendent receives notice that the holder of the permit has been convicted of a crime under section 6—106.1(a)(10) or (a)(11) of the Vehicle Code. (Ill. Rev. Stat. 1989, ch. 95½, pars. 6—106.1(a)(10), (a)(11).) The fact that the Secretary of State has not revoked the grievant's school bus driver's license does not foreclose reference to section 6—106.1 of the Vehicle Code in determining the public policy.

Section 6—106.1(a)(5) of the Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 6—106.1(a)(5)) states that an applicant seeking a school bus driver permit must have "demonstrated ability to exercise reasonable care in the operation of school buses in accordance with such standards as the State Superintendent of Education prescribes." Pursuant to this statutory mandate, the Illinois State Board of Education set forth its rules and regulations in a manual entitled "Basic Competencies for School Bus Drivers." In the opening pages of that manual, the following language appears:

> "Perhaps in no other area of education does a local board of education or school administrative staff accept more responsibility for student life and welfare than during the mass movement of children in school transportation vehicles on the public highway, streets and roads of your State. Therefore, as a member of the 'safety team', we must not only provide adequate equipment but constantly strive to improve operational safety and efficiency."

Clearly the Illinois State Board of Education believes there is a public policy favoring the safe transportation of school children. Moreover, the District's own rules and regulations indicate that a public policy in favor of the safe transportation of school children exists. For example, in the District's "Professional Driver's Handbook," the introduction and forward emphasize the responsibility placed on school bus drivers for the safety of their students. Finally, in the school district's disciplinary rules and regulations for bus drivers, employees are made aware that disciplinary action will be taken "to ensure the safety of the pupils of the school district and to bring the employee's general conduct and actions which are considered unsafe into compliance with accepted standards."

All of these statutes demonstrate the legislature's intent that any transportation authorized by school boards for school children be safe. Furthermore, it is obvious that the District is concerned with the safe transportation of its school children since its regulations require bus drivers to operate their buses safely.

### III. JUDICIAL DECISIONS

Finally, support for a determination that a public policy in favor of the safe transportation of school children exists can be found in judicial decisions. Initially, there is a general public policy of protecting the public welfare through the enactment of laws regulating highways. The Illinois Supreme Court stated:

> "No reasonable person would question not only the right but the absolute duty of the legislature to impose[ ] these regulations [the various legislative acts making up the motor vehicle law] upon those who use the streets and roads of the State. All these regulations, including even prohibitions which stand in substantial relationship to the public welfare, must be presumed by the courts to be necessary for the purpose of protecting public health, safety and morals, and must be sustained under the police power of the State." *People v. Warren* (1957), 11 Ill. 2d 420, 425-26, 143 N.E.2d 28, 32.

Moreover, courts have specifically recognized a desire to transport children to school safely. In *Van Cleave v. Illini Coach Co.* (1951), 344 Ill. App. 127, 129, 100 N.E.2d 398, 399, the court, in adopting the standard of care required in the operation of a school bus, stated: "[T]hose engaged in the transportation of school children should be held to exercise the highest degree of care." Likewise, in *People v. Davis* (1980), 88 Ill. App. 3d 728, 732, 410 N.E.2d 673, 676, the court explicitly stated:

> "School bus drivers are required to transport children safely between the school and home, and it is a necessary corollary to this duty that they be accorded the concomitant authority to maintain safety on the school bus."

After thoroughly examining the Constitution, the laws and judicial decisions of this State, as well as the regulations promulgated by the District and the State Board of Education, the inevitable conclusion is that a public policy favoring the safe transportation of school children exists. The purposes and policies of the School Code, the Vehicle Code, the Illinois Rules of the Road, along with the Constitution and the decisions of our courts, combine to support this public policy.

Since we have determined this public policy exists, the question then becomes whether the arbitrator's award violates this public policy. The Union argues the *AFSCME* decision stands for the proposition that an award may be vacated on public policy grounds only when the award requires or sanctions a violation of law. The Union further argues that the *reinstatement* of the grievant rather than her past conduct must be contrary to public policy.

The Board, also relying on *AFSCME*, contends by brief that the public policy must "mandate[ ] the discharge" of the employee under the facts as found by the arbitrator. Since the arbitrator found only that the grievant improperly operated her bus, but she was never convicted or arrested for any offense, the award must be upheld.

The District responds that the grievant need not have been convicted of a crime, nor is the application of the public policy exception limited to situations wherein public policy created by a law mandates the discharge. Rather, it is permissible to look at the past conduct of the grievant to determine whether public policy is offended by reinstatement. Thus, since the arbitrator found the grievant improperly operated her bus on numerous occasions, her past conduct in doing so violates the public policy favoring the safe transportation of school children.

This court recently addressed this public policy issue in *Department of Central Management Services v. American Federation of State, County & Municipal Employees* (1990), 197 Ill. App. 3d 503, 554 N.E.2d 759 (hereinafter *CMS*). There, five correctional officers were discharged because of various regulation violations. Debra Santel (Santel) used illicit drugs with a former inmate and failed to make various reports about her contact with this former inmate. Two other officers were discharged for using excessive force on a prisoner and failing to report the incident. The final two officers were also discharged for failing to report that incident and conduct unbecoming an officer. All of these discharges were the subject of arbitration and the arbitrator reinstated all five correctional officers.

This court first stated that a clear public policy existed against battering prisoners. (*CMS*, 197 Ill. App. 3d at 514, 554 N.E.2d at 766.) As such, the reinstatement of the two officers who battered the prisoner was against public policy. Likewise, this court held reinstating the correctional officer who used illicit drugs with a former inmate violated the public policy against the use of such drugs. This court noted Santel did not commit a crime when she was under investigation for allegedly agreeing to smuggle drugs into the prison and, thus, if the discharge only concerned that period of time, her rein-

statement would not have been against public policy. However, this court looked at her misconduct prior to that point in time; namely, when she used illegal drugs with the former inmate. "[W]hen employees in sensitive positions commit such serious offenses as violating drug laws, public policy requires the employer to have the ability to discharge them." *CMS*, 197 Ill. App. 3d at 515, 554 N.E.2d at 767.

Finally, with respect to the two officers discharged because of a failure to report the incidents, this court stated:

> "[T]he mere violation of regulations requiring the reporting of misconduct by other employees, however serious, has an insufficient nexus to any public policy expressed in the constitution, laws, or court decisions to require employers to have a right to discharge for said conduct." *CMS*, 197 Ill. App. 3d at 515, 554 N.E.2d at 767.

■ We agree with the District that the grievant's past conduct can be examined to determine whether the award violates public policy. In *CMS*, this court stated, with respect to Santel's discharge, that the laws against the use of illegal drugs created the public policy which was contravened by the award insofar as it granted reinstatement. Therefore, the illegal conduct of Santel, within the context of the duty imposed on a correctional officer, could be considered. (*CMS*, 197 Ill. App. 3d at 515, 554 N.E.2d at 767.) We consider the grievant's conduct within the context of the duty imposed upon her as a school bus driver. That duty requires the grievant to operate her bus in a safe and reasonable manner to protect the safety of the children on the bus as well as the general public on the road. The arbitrator specifically found that the preponderance of the evidence established the grievant improperly operated her bus on three occasions. Thus, reinstating the grievant would violate public policy. There is clearly a nexus between grievant's driving and the "safe transportation of children."

Both the Union and the Board contend *AFSCME* is controlling. We disagree. In that case, two employees of a State mental health facility made an unauthorized trip to a flea market. While they were gone, a resident who had been left unattended died. The employees were not responsible for that particular resident and the arbitrator specifically found there was no nexus between their unauthorized trip and the death. In fact, the employees had exemplary records.

Nevertheless, both employees were discharged for the mistreatment of a service recipient. They challenged their terminations and eventually an arbitrator ordered them reinstated with a four-month suspension without pay. The appellate court upheld this award, and

the supreme court affirmed, holding there was no violation of any public policy.

The court's decision in *AFSCME* was premised on the arbitrator's finding that the grievants were exemplary employees, that punishment had been imposed upon them, and that no nexus existed between their conduct and the patient's death. The patient who died was a resident of the male wing of the hospital, and the employees were assigned to the female wing of the hospital. The arbitrator found no direct link between their unauthorized absence and the resident's death. On the other hand, here, the grievant is not an exemplary employee. Her personnel file reveals several instances of misconduct, disciplinary action, and unprofessional conduct. Furthermore, a direct nexus exists between her conduct of improperly driving her school bus and the potential injury to either the school children or other motorists on the road. Therefore, we find *AFSCME* distinguishable.

Although not binding, we find the Eleventh Circuit's decision in *Delta Air Lines, Inc. v. Air Line Pilots Association, International* (11th Cir. 1988), 861 F.2d 665, persuasive. There, an airline pilot was discharged after he flew his aircraft while drunk. An arbitration award ordered the pilot reinstated without back pay. The System Board of Adjustment found no just cause for the discharge and concluded the pilot should have been offered the option of entering Delta's alcohol rehabilitation program. The district court set aside the award, finding it clearly violated a public policy against allowing pilots to fly aircraft while intoxicated. (*Delta Air Lines, Inc. v. Airline Pilots Association* (N.D. Ga. 1987), 686 F. Supp. 1573.) Both parties cross-appealed.

The court of appeals first stated:

> "The public policy of which the Supreme Court speaks in *Misco* seems to be a public policy not addressing the disfavored conduct, in the abstract, but disfavored conduct which is *integral to the performance of employment duties*. The question we are instructed, by *Misco*, to ask is not, 'Is there a public policy against the employee's conduct?', but, rather, 'Does an established public policy condemn the performance of employment activities in the manner engaged in by the employee?' " (Emphasis in original.) (*Delta Air Lines*, 861 F.2d at 671.)

In holding the award of reinstatement violated public policy, the court then stated:

> "When public policy is offended by what a person does, unrelated to the performance of his employment duties, an em-

ployer may well conclude that he should discharge that person as an expression of disapproval, though there be no public policy one way or the other. Where the person performs his employment duties and, *in doing so*, violates standards, restraints and restrictions on conduct, clearly and explicitly established by the people in their laws, a requirement that the employer suffer that malperformance and not discharge the offender does itself violate the same well established public policy." (Emphasis in original.) (*Delta Air Lines*, 861 F.2d at 674.)

Therefore, the court concluded, because what the employee did in the performance of his employment was the very thing which offended the public policy, his reinstatement would violate public policy.

We find the instant case analogous to *Delta Air Lines*. The fact that the pilot flew the plane while under the influence of alcohol expressly conflicted with the public policy against flying airplanes while intoxicated. Likewise, the grievant drove her bus recklessly thereby endangering the children on her bus, which expressly conflicts with a public policy favoring the safe transportation of school children. As in *Delta Air Lines*, it was the conduct of the employee *in the course of employment* which violated public policy; and her reinstatement would contravene that public policy.

The arbitrator found the grievant was not afforded progressive discipline, as provided in section 16.1 of the Agreement. However, that section also stated the progressive discipline requirement would not prevent the school board from taking immediate action for unusual or severe circumstances. We find the grievant's driving habits both severe and unusual. Therefore, the District was not required to utilize the progressive discipline policy.

We hold the arbitrator's award, reinstating the grievant to her position as a school bus driver, is contrary to the public policy favoring the safe transportation of school children. The grievant has a complete disregard for the safety of the children on her school bus. Her driving tactics are inexcusable. Allowing her to continue driving would only put the lives of those children at stake. The decision of the Board is reversed.

Reversed.

LUND, P.J., and SPITZ, J., concur.