614 N.E.2d 513 (1993)
245 Ill. App.3d 87
185 Ill.Dec. 379
The DEPARTMENT OF CENTRAL MANAGEMENT SERVICES and Illinois Department of Children and Family Services, Plaintiffs-Appellees,
v.
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME), AFL-CIO, Defendant-Appellant.
No. 4-92-0628.
Appellate Court of Illinois, Fourth District.
Argued February 17, 1993.
Decided May 20, 1993.
Gilbert Feldman Cornfield and Feldman (argued), Chicago, for defendant-appellant.
Roland W. Burris, Atty. Gen., Rosalyn B. Kaplan, Sol. Gen., Jerald S. Post, Asst. Atty. Gen. (argued), for plaintiffs-appellees.
Justice KNECHT delivered the opinion of the court:
Mary Pat King (grievant) was discharged from her position as a child protective investigator for the Illinois Department of Children and Family Services (DCFS). This termination was challenged by defendant *514 American Federation of State, County and Municipal Employees (AFSCME), the exclusive bargaining representative for State child protective investigators. The parties eventually submitted the grievance to arbitration, where an arbitrator determined grievant should be reinstated. (Illinois Department of Central Management Services v. American Federation of State, County & Municipal Employees (Dec. 7, 1991), Arb. No. 1778 (62/XX-XXXX-XX(204997)) (Benn, arb.) (hereinafter arbitrator's award).) The circuit court of Sangamon County vacated this award, and AFSCME appeals. We affirm.
FACTS
The facts of this case, as determined by the arbitrator, are not in dispute. Grievant was hired by DCFS as a child protective investigator on September 23, 1988. A child protective investigator receives reports of abuse and investigates them to determine whether they are substantiated or unfounded. The present grievance centers around grievant's handling of a particular report of child abuse.
On or about February 16, 1990, grievant received a report of an alleged child abuse by a mother of her daughter. The report was initiated by the estranged father of the child. Grievant interviewed the child and the mother but did not interview the brother of the allegedly abused child, an apparent witness to the abuse. She fabricated an investigative report dated February 26, 1990, however, in which she claimed to have interviewed the brother at his school. The arbitrator's award quotes the following language from grievant's report regarding her interview with the brother:
"`I got marks on my face [and] so did Jenn. We were making cupcakes in kitchen at Bill's [and] Jenn was taking all the sprinkles. I grabbed them [and] we started fighting. Mom yelled at us then she grabbed my arm [and] her finger hit Jenn. Jenn started crying.
On the way home Jenn would not give me the book I wanted so I grabbed it [and] mom turned around and tried to push me away from Jenn. Her hand hit Jenn's face [and] my face but I didn't cry. Jenn did. Mom put us in our room for fighting and spanked us too. On the butt.
We visit Dad and Saturday [and] Sunday at Grandpa's house.'" Arbitrator's award, at 5.
Based on grievant's investigation of the case, she believed the case of abuse was unfounded and recommended the case not be written up, i.e., "not indicated." After speaking with the father of the allegedly abused child and receiving a tape recording and some pictures of the little girl, grievant's supervisor, Kathryn Bischoff, informed grievant the case should be "indicated" and instructed her to write the case up. The interview allegedly done by grievant with the brother had no impact on Bischoff's decision to reverse grievant's recommendation. Rather, she relied on the tape recording and pictures of the child. Ardis Cook, the DCFS child protection manager for the Rockford office, reviewed the case and, after speaking with the father, recommended the case be "indicated." The case was "indicated" at that point, and grievant's recommendation was rejected.
The mother later wrote a letter to DCFS requesting the indication of abuse be overturned. One of the reasons cited for the case being overturned was grievant had not interviewed the brother regarding the incident. Following receipt of the letter, Bischoff met with grievant and asked her if she had interviewed the brother. She also showed her a letter from the brother's teacher, indicating no one from DCFS had ever taken the child from the teacher's room to be interviewed. Grievant told Bischoff she could not remember any of the circumstances surrounding the interview, but after reviewing a calendar, later explained she did remember what happened and had interviewed the brother at his school on February 26, 1990.
At a predisciplinary meeting, Bischoff asserted she had spoken with the brother's principal and teacher, and both stated grievant had not visited the school to interview the brother on the day she stated she had. Because Bischoff believed grievant *515 falsified her report, she recommended grievant be discharged. Grievant was thereafter discharged effective May 29, 1991. Discharge was cited as the appropriate level of discipline because the falsification rendered her unsuitable for continuation in her current position, pursuant to personnel rules, section 302.700 of title 80 of the Illinois Administrative Code (Code) (80 Ill.Adm.Code § 302.700 (1991)). Grievant had not been disciplined prior to this incident.
The mother ultimately appealed the local determination of an indication of abuse. On appeal, Cook, who had previously reviewed the case and recommended it be indicated, reversed that determination and held the allegations were unfounded. This ruling was due to a discrepancy over the length of the mother's nails and, in part, the fact the brother had not been interviewed.
At all times relevant to the case, grievant was covered by a collective-bargaining agreement which was effective July 1, 1989, to June 30, 1991. Article V of this agreement provided for arbitration of certain disputes arising under the agreement. Article IX, section 1, provided:
"The Employer agrees with the tenets of progressive and corrective discipline. Disciplinary action or measures shall include only the following:
(a) Oral reprimand;
(b) Written reprimand;
(c) Suspension (notice to be given in writing); and
(d) Discharge (notice to be given in writing).
Disciplinary action may be imposed upon an employee only for just cause."
Pursuant to the collective-bargaining agreement, AFSCME filed a grievance challenging the discharge, alleging grievant was dismissed from her position without just cause as required under article IX of the collective-bargaining agreement. When the parties were unable to settle the grievance, it was submitted to arbitration.
Arbitrator Edwin H. Benn found the grievant did not interview the brother of the allegedly abused child and the investigative report had been falsified. He nevertheless held just cause did not exist for the discharge. In concluding just cause did not exist, the arbitrator examined the following series of inquiries:
"(1) As a matter of contract, does the high degree of public scrutiny that DCFS and its employees face require discharge in this case?
(2) If not, does that high degree of public scrutiny require discharge in terms of the application of the requirements of progressive discipline?
(3) If not, under the requirements of progressive discipline, did Grievant's misconduct justify the bypassing of lesser forms of progressive discipline?
(4) If not, has the Employer demonstrated that progressive discipline will not work? and
(5) If not, what measure of discipline is appropriate?"
In answering the first question, the arbitrator maintained DCFS had agreed in article IX, section 1, of the collective-bargaining agreement to follow the tenets of progressive and corrective discipline which consisted of oral and written reprimands and suspensions prior to discharge. Since no special provisions were negotiated for DCFS employees, as a matter of contract, the concept of progressive discipline had to be applied. The fact DCFS was subject to a high degree of public scrutiny did not obviate the application of progressive discipline and was, he concluded, irrelevant.
The arbitrator then found working for a high-profile agency did not require deviation from the application of progressive discipline. He reasoned the function of progressive discipline was to attempt to rehabilitate the errant employee, and not to punish or set an example for others. He found the reasons for discharging grievant were a reaction to the high-profile nature of the department and for the purpose of setting an example for other employees that similar conduct would not be tolerated. He maintained allowing discharge under these circumstances would be inconsistent *516 with progressive discipline's underlying premise of rehabilitation.
While the arbitrator asserted progressive discipline need not be applied in all cases those being where the offense is of an extremely serious natureand found the grievant's actions were "serious," he determined they "were not of such a degree" as to mandate discharge. The arbitrator reasoned no rule was cited by DCFS which mandated discharge for such an offense. While DCFS relied on section 302.700 of the personnel rules to discharge grievant, he found this section to be a general statement of grounds for discharge as opposed to a specific rule attaching a measure of discipline for the kind of misconduct engaged in by a grievant. The lack of a citation to a rule led the arbitrator to the conclusion discharge for such conduct was not mandated in every incident.
Moreover, in examining the exact nature of the misconduct, the arbitrator determined the substance of the alleged interview had no effect on the determination the mother had abused the daughter. The decision to pursue the allegation was premised upon information received from the father. The falsified information was, the arbitrator concluded, immaterial to the decision-making process at that time. This lack of materiality "weigh[ed] against the seriousness of Grievant's misconduct insofar as determining if progressive discipline [could] be bypassed."
The arbitrator further found DCFS had not shown grievant had been unsuccessfully disciplined in the past or that her conduct justified bypassing progressive discipline, nor had DCFS shown grievant was beyond rehabilitation. In short, he determined progressive discipline had not been given a chance to work. Using principles of progressive discipline, the arbitrator went on to determine grievant's discharge should be reduced to a suspension and ordered reinstatement without back pay.
Plaintiffs, thereafter, filed a motion to vacate the arbitrator's award (Ill.Rev.Stat. 1991, ch. 10, par. 112) based on public policy considerations and because the arbitrator exceeded his authority. The trial court vacated the arbitrator's award because it exceeded the arbitrator's authority and was against the "public policy of [Illinois] as set forth in the Abused and Neglected Child Reporting Act (Ill.Rev.Stat.1991, [c]h. 23, [par.] 2051 et seq.) and procedure 300.100(c)(3) [sic][,] adopted May 11, 1989, implementing 89 Illinois Administrative Code, Section 300.100." Accordingly, the court ordered grievant discharged from her position as a child protective investigator. This appeal followed.
ANALYSIS
Plaintiffs challenged the validity of the arbitrator's award, first contending the award violated public policy, and second, the arbitrator exceeded his authority in entering such an award. At oral argument, plaintiffs conceded, however, the arbitrator exceeded his authority only to the extent his award violated public policy. If this court concludes a clear and dominant public policy does not exist requiring the arbitrator's award be vacated, plaintiffs acknowledged the arbitrator had the authority to enter the order. The sole issue before us is whether the arbitrator's award violated public policy.
Judicial review of an arbitrator's award is extremely limited. (American Federation of State, County & Municipal Employees v. State of Illinois (1988), 124 Ill.2d 246, 254, 124 Ill.Dec. 553, 556, 529 N.E.2d 534, 537 (AFSCME); Board of Education of School District U-46 v. Illinois Educational Labor Relations Board (1991), 216 Ill.App.3d 990, 998, 159 Ill.Dec. 802, 806, 576 N.E.2d 471, 475 (District 46).) A labor arbitration award must be enforced if the arbitrator acts within his scope of authority and the award draws its essence from the parties' collective-bargaining agreement. (United Paperworkers International Union v. Misco, Inc. (1987), 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286, 298; AFSCME, 124 Ill.2d at 254, 124 Ill.Dec. at 556, 529 N.E.2d at 537.) An arbitrator's award, however, may not stand if it contravenes paramount considerations of public policy. (AFSCME, 124 Ill.2d at 260, 124 Ill.Dec. at 559, 529 *517 N.E.2d at 540; Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600 (1979), 74 Ill.2d 412, 423-24, 24 Ill. Dec. 843, 848, 386 N.E.2d 47, 52; City of Springfield v. Springfield Police Benevolent & Protective Association, Unit No. 5 (1992), 229 Ill.App.3d 744, 751, 171 Ill.Dec. 236, 240, 593 N.E.2d 1056,1060; City of De Kalb v. International Association of Firefighters, Local 1236 (1989), 182 Ill.App.3d 367, 372, 131 Ill.Dec. 492, 495, 538 N.E.2d 867, 870.) If the contract as interpreted by the arbitrator violates some express public policy, courts are obliged to refrain from enforcing it. W.R. Grace & Co. v. Local Union 759 (1983), 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307; District U-46, 216 Ill.App.3d at 998, 159 Ill. Dec. at 807, 576 N.E.2d at 476.
A court's refusal to enforce an arbitrator's award because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. (Misco, 484 U.S. at 42, 108 S.Ct. at 373, 98 L.Ed.2d at 301; District U-46, 216 Ill.App.3d at 998, 159 Ill.Dec. at 807, 576 N.E.2d at 476.) While there is no precise definition of public policy, it is to be found in the constitution and statutes and, when these are silent, in its judicial decisions. (AFSCME, 124 Ill.2d at 260, 124 Ill.Dec. at 559, 529 N.E.2d at 540; De Kalb, 182 Ill. App.3d at 372, 131 Ill.Dec. at 495, 538 N.E.2d at 870; Department of Central Management Services v. American Federation of State, County & Municipal Employees (1990), 197 Ill.App.3d 503, 512, 143 Ill.Dec. 824, 830, 554 N.E.2d 759, 765 (hereinafter CMS).) Such a public policy must be well-defined and dominant, and is to be ascertained "`by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" W.R. Grace & Co., 461 U.S. at 766, 103 S.Ct. at 2183, 76 L.Ed.2d at 307, quoting Muschany v. United States (1945), 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744, 756.
The public policy of a State or nation must be determined by its constitution, laws, and judicial decisionsnot by the varying opinions of laymen, lawyers, or judges as to the demands of the interests of the public. (AFSCME, 124 Ill.2d at 260, 124 Ill.Dec. at 559, 529 N.E.2d at 540.) The public policy exception which permits vacatur of arbitration awards rising from collective-bargaining agreements is an "extremely narrow" concept (CMS, 197 Ill.App.3d at 512, 143 Ill.Dec. at 830, 554 N.E.2d at 765), and in order to vacate an arbitrator's award, the public policy violation must be clearly shown. AFSCME, 124 Ill.2d at 261, 124 Ill.Dec. at 560, 529 N.E.2d at 540-41.
We agree with plaintiffs: a "well-defined and dominant" public policy exists in Illinois favoring the protection of children, including protecting children from abuse. This public policy is evidenced by the numerous statutes enacted by the legislature with a dominant purpose of protecting children. See, e.g., Disclosure of Offenses Against Children Act (Ill.Rev.Stat. 1991, ch. 23, par. 2240 et seq.); Intergovernmental Missing Child Recovery Act of 1984 (Ill. Rev.Stat.1991, ch. 23, par. 2251 et seq.); Abandoned Refrigerator Act (Ill.Rev.Stat. 1991, ch. 23, par. 2355.9 et seq.); Sale of Tobacco to Minors Act (Ill.Rev.Stat.1991, ch. 23, par. 2356.9 et seq.); Smokeless Tobacco Limitation Act (Ill.Rev.Stat. 1991, ch. 23, par. 2358-21 et seq.); Sale of Immoral Publications to Children Act (Ill.Rev.Stat. 1991, ch. 23, par. 2362.9 et seq.); Child Labor Law (Ill.Rev.Stat.1991, ch. 48, par. 31.1 et seq.); Child Passenger Protection Act (Ill.Rev.Stat.1991, ch. 95½ par. 1101 et seq.); Child Vision and Hearing Test Act (Ill.Rev.Stat. 1991, ch. 23, par. 2331 et seq.); Child Witness Trauma Reduction Act (Ill. Rev.Stat.1991, ch. 37, par. 800 et seq.); Illinois Poison Prevention Packaging Act (Ill. Rev.Stat.1991, ch. 111½, par. 291 et seq.); Child Care Act of 1969 (Ill.Rev.Stat.1991, ch. 23, par. 2211 et seq.); Wrongs to Children Act (Ill.Rev.Stat.1991, ch. 23, par. 2351 et seq.); Intergovernmental Missing Child Recovery Act of 1984 (Ill.Rev.Stat. 1991, ch. 23, par. 2251 et seq.); Minor Identification and Protection Act (Ill.Rev.Stat. *518 1991, ch. 23, par. 2451 et seq.); Interstate Compact on Placement of Children Act (Ill. Rev.Stat.1991, ch. 23, par. 2601 et seq.); Abandoned Children Prevention Act (Ill. Rev.Stat.1991, ch. 23, par. 2358-90 et seq.); Neglected Children Offense Act (Ill.Rev. Stat.1991, ch. 23, par. 2359.9 et seq.); "An Act to revise the law in relation to criminal jurisprudence" (Ill.Rev.Stat.1991, ch. 23, par. 2368 et seq.); Improper Supervision of Children Act (Ill.Rev.Stat.1991, ch. 23, par. 2368.9 et seq.); Child Curfew Act (Ill.Rev. Stat.1991, ch. 23, par. 2370.9 et seq.); Missing Children Registration Law (Ill.Rev.Stat. 1991, ch. 23, par. 2270 et seq.); Child Sexual Abuse Prevention Act (Ill.Rev.Stat.1991, ch. 23, par. 2080 et seq.); and various sections of the Criminal Code of 1961 (e.g., Ill.Rev.Stat.1991, ch. 38, pars. 10-5 (child abduction), 10-6 (harboring a runaway), 11-20.1 (child pornography), 11-21 (harmful material), 12-4.3 (aggravated battery of a child), 12-4.4 (aggravated battery of an unborn child), 33D-1 (contributing to the criminal delinquency of a juvenile)).
More specifically, in the area of child abuse, the State has a strong interest in protecting children where the potential for abuse or neglect exists and in curtailing the incidences of child abuse. (See Lehman v. Stephens (1986), 148 Ill.App.3d 538, 547, 101 Ill.Dec. 736, 742, 499 N.E.2d 103, 109.) In 1963, the legislature enacted the Children and Family Services Act (Services Act) (Ill.Rev.Stat.1991, ch. 23, par. 5001 et seq.), with the specific purpose of "creating] a Department of Children and Family Services [ (DCFS) ] to provide social services to children and their families, to operate children's institutions, and to provide certain other rehabilitative and residential services as enumerated." (Ill.Rev. Stat.1991, ch. 23, par. 5001.) DCFS is the single State agency for the planning and coordinating of child abuse and neglect prevention programs and services. (Ill.Rev. Stat.1991, ch. 23, par. 5004a(a).) Each year, DCFS is to submit a comprehensive child abuse and neglect prevention plan to the legislature. One element of this plan is to propose strategies to "meet the goal of reducing the incidence of child abuse and neglect and reducing the number of reports of suspected child abuse and neglect made to the Department." Ill.Rev.Stat.1991, ch. 23, par. 5004a(a).
Under the Abused and Neglected Child Reporting Act (Ill.Rev.Stat.1991, ch. 23, par. 2051 et seq.), DCFS is also the sole agency responsible for receiving and investigating reports of child abuse or neglect. (Ill.Rev.Stat.1991, ch. 23, par. 2057.3.) Upon receiving reports of abuse, DCFS is required to protect the best interests of the child, offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment, preserve family life whenever possible and protect the health and safety of children in all situations in which they are vulnerable to child abuse and neglect. (Ill.Rev.Stat. 1991, ch. 23, par. 2052.) Once a report of child abuse is received, the following procedure is employed in the investigation of suspected child abuse or neglect cases:
"(2) * * * Upon receipt of a report [of suspected child abuse], the Child Protective Service Unit shall make an initial investigation and an initial determination whether the report is a good faith indication of alleged child abuse or neglect.
(3) If [DCFS] determines the report is a good faith indication of alleged child abuse or neglect, then a formal investigation shall commence and, pursuant to Section 7.12 of this Act, may or may not result in an indicated report. The formal investigation shall include: direct contact with the subject or subjects of the report as soon as possible after the report is received; an evaluation of the environment of the child named in the report and any other children in the same environment; a determination of the risk to such children if they continue to remain in the existing environments, as well as a determination of the nature, extent and cause of any condition enumerated in such report; the name, age and condition of other children in the environment; and an evaluation as to whether there would be an immediate and urgent necessity to remove the child from the environment if appropriate family preservation services were provided." *519 (Emphasis added.) Ill.Rev.Stat.1991, ch. 23, pars. 2057.4(b)(2), (b)(3).
Under the agency's procedural regulations, investigators are required to contact all noninvolved child subjects and to document such interviews during formal investigations. Sections 300.110(c)(3) and (d) of DCFS internal rules provide: "c) * * *

* * * * * *
3) All Children in the Household

The investigative worker is required to establish in-person contact with all other children who are regular members of the household of the alleged child victim, as well as other children who are listed on the CANTS 1, Oral Report, prior to indicating the report.
If the abuse/neglect is alleged to have occurred in a household other than the child's regular household, licensed or unlicensed, and the alleged perpetrator is a member of that other household (e.g., a day care home, the home of a baby-sitter, the home of a relative caretaker, etc.), the investigative worker is required to establish in-person contact with all of the children who are regular members of that other household, as well. In cases where the perpetrator is accused of abusing or neglecting the child in the child's own home, the investigation must be expanded to include interviews with any children in the perpetrator's own home.
The investigative worker shall interview all children, in person and either individually or in a group as required by the investigative standards, out of the presence of the child's caretaker and the alleged perpetrator, if at all possible. Another person whom the child trusts but who is not the alleged perpetrator may be present during the interview if it will make the child more comfortable.
* * * * * *
d) Documentation of Required Contacts

1) CA/N Investigation Interview Note (CANTS 17A)

The investigative worker shall make an entry on the CANTS 17A for every completed or attempted contact/interview with the adult members of the household, the alleged perpetrator(s) and the non-involved children. Completed CANTS 17A should contain a summary of the facts gathered during the interviews, a description of the environment and the investigator's assessment of the credibility of the interviewee." (Emphasis in original.)
The whole mission of DCFS is to protect children from abuse and to prevent it from occurring. It is also the State agency responsible for providing protective and welfare services to abused and neglected children and their families. Inherent in the public policy of protecting children from abuse we find another public policy requiring accurate documentation of investigations. Investigations into alleged cases of child abuse must necessarily be complete and accurate. The written report in question was entirely fabricatednot only was it reported that an interview was conducted, when in fact it was not, but the grievant made up the details of the child's statements, as reflected in the quoted passage from the arbitrator's award. Not surprisingly the detailed statements she made up supported the recommendation she was to make, i.e., the case be "not indicated." The fabrication of reports directed to the agency's mission undermines both DCFS' ability to fulfill its mission of protecting children from abuse and reducing the incidence of abuse, and diminishes the public perception of the agency and its staff. The statutory duty and purpose of DCFS, coupled with the State's interest in protecting children from abuse at the very least indicates a public policy favoring the accurate and complete reporting of investigations.
Because we find, after an examination of the statutes, as well as the regulations promulgated by DCFS, a public policy favoring truthful documentation of child abuse investigations exists, we next address whether the arbitrator's award violated this public policy. Grievant's conduct in fabricating the report must be considered in context of the duty imposed upon her in *520 her sensitive position of investigating allegations of child abuse. (See District U-46, 216 Ill.App.3d at 1004, 159 Ill.Dec. at 810-11, 576 N.E.2d at 479-80.) Public policy mandates truthful reporting of child abuse investigations, and the arbitrator found she did in fact falsify the report. Thus, under the circumstances, reinstating the grievant would violate public policy. It is the grievant's specific conduct in the course of her employment which violates public policy. The safety and well-being of children require zealous investigation and honest reporting. Fabricating investigative reports endangers the lives of children suspected of living in an abusive environment. Public policy demands such conduct not be tolerated by employers and that they have power to discharge those engaging in such activity. Public policy cannot countenance reinstatement of this grievant. Her lies must be considered in the context of the duty imposed upon her by her position. Her lies defeat the essential purpose of her jobto investigate child abuse and protect children and families.
The amenability of a grievant to further discipline is irrelevant in cases being reviewed on public policy grounds. Furthermore, it was fortuitous that no harm resulted in this case from the falsification of reports. Simply because no one was hurt this time is insignificant. Grievant's dishonesty on such a significant issue makes progressive discipline a risk that the children of this State need not take.
We also reject defendant's contention the trial court erred in finding public policy existed in departmental regulations. In vacating the arbitrator's award, the court found the award violated the public policy set forth in DCFS' procedural regulations. These regulations are not part of the Code, but rather are part of the agency's internal procedural manual, which sets forth procedures to implement certain sections of the Code. While case law makes clear public policy must be found in the constitution, statutes, and judicial decisions, we find departmental regulations promulgated to fulfill a legislative mandate may be considered. (See District U46, 216 Ill.App.3d at 1001, 159 Ill.Dec. at 808-09, 576 N.E.2d at 477-78.) Moreover, even if an agency's rules cannot be considered, we note the regulation was not the only source for the trial court's finding. It also found the award violated the public policy set forth in the Act.
We also find meritless defendant's argument this court applied the wrong standard in CMS, City of Springfield, Board of Education of Harrisburg Community Unit School District No. 3 v. Illinois Educational Labor Relations Board (1992), 227 Ill.App.3d 208, 169 Ill.Dec. 205, 591 N.E.2d 85, and District U-46. In each case, this court focused on whether there existed a public policy governing the case and whether the arbitrator's award violated such policy. This is clearly in accord with the standards set forth in case law for vacating arbitration awards on public policy grounds. Moreover, in these cases we did not improperly reweigh facts determined by an arbitrator.
Defendant alternatively argues if this court determines the arbitrator's award violates public policy, this court should remand the case to the arbitrator for an appropriate remedy. This is not a proper case for remandment. We affirm the trial court's judgment.
Affirmed.
STEIGMANN, P.J., and COOK, J., concur.