# STATE OF MICHIGAN

# COURT OF APPEALS

SS Next Friend of Minor LM, DS Next Friend of
Minor SD, MJ Next Friend of Minor MS, DC Next
Friend of LB, TF Next Friend of Minors DF, ID,
and FC, LH Next Friend of Minor CM,

      Plaintiffs-Appellees,

v

STATE OF MICHIGAN, STATE BOARD OF
EDUCATION, DEPARTMENT OF
EDUCATION, and STATE SUPERINTENDENT
OF PUBLIC INSTRUCTION,

      Defendants-Appellants,

and

HIGHLAND PARK SCHOOL DISTRICT,
HIGHLAND PARK SCHOOL DISTRICT
EMERGENCY MANAGER, HIGHLAND PARK
PUBLIC SCHOOL ACADEMY SYSTEM, and
LEONA GROUP, L.L.C.,

      Defendants.

FOR PUBLICATION
November 6, 2014

Nos. 317071; 317072
Wayne Circuit Court
LC No. 12-009231-CZ

SS Next Friend of Minor LM, DS Next Friend of
Minor SD, MJ Next Friend of Minor MS, DC Next
Friend of LB, TF Next Friend of Minors DF, ID,
and FC, and LH Next Friend of Minor CM,

      Plaintiffs-Appellees,

v

No. 317073
Wayne Circuit Court
LC No. 12-009231-CZ

-1-

STATE OF MICHIGAN, STATE BOARD OF
EDUCATION, DEPARTMENT OF
EDUCATION, STATE SUPERINTENDENT OF
PUBLIC INSTRUCTION, HIGHLAND PARK
PUBLIC SCHOOL ACADEMY SYSTEM, and
LEONA GROUP, L.L.C.,

             Defendants,

and

HIGHLAND PARK SCHOOL DISTRICT and
HIGHLAND PARK SCHOOL DISTRICT
EMERGENCY MANAGER,

             Defendants-Appellants.

---

Before:  MURRAY, P.J., and JANSEN and SHAPIRO, JJ.

SHAPIRO, J. (*dissenting*).

In one of the most significant cases of the last century, the United States Supreme Court declared that, "education is perhaps the most important function of state and local governments." *Brown v Topeka Bd of Ed*, 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954).  Nine years after that decision, the people of this state approved a new Constitution providing that local school districts "shall" provide an education to all students and that the legislature "shall" maintain and support such schools.  Const 1963, art 8, §§ 1-2.  Sadly, my colleagues in the majority have judicially repealed these provisions with their decision today.  They have also, by judicial fiat, repealed a legislative enactment that requires school districts to take specific action where pupils fail to attain basic competencies.  MCL 380.1278(8).

I reject the majority's miserly view of the education constitutionally due Michigan's children.  I agree with the majority that the judiciary is not suited to, and should avoid attempting to, manage school administration or fine tune educational policy.  However, this does not excuse the majority's abandonment of our essential judicial roles, that of enforcement of the rule of law even where the defendants are governmental entities, and of protecting the rights of all those who live within Michigan's borders, particularly those, like children, who do not have a voice in the political process.  While the judiciary is not suited to selecting and executing educational policy, it is suited to determining whether defendants are complying with their constitutional and statutory duties and ordering them to take timely action to do so.

## I. PLAINTIFFS' ALLEGATIONS AND THE MAJORITY'S CONCLUSIONS

Plaintiffs, students of defendant Highland Park School District (HPSD), allege that the government defendants violated their constitutional rights under Const 1963, art 8, §§ 1 and 2, and violated their own statutory duties under MCL 380.1278(8).  Defendants assert that plaintiffs' complaint does not state a cause of action.  That complaint, as noted by the trial court in denying defendants' motion for summary disposition, contains a lengthy list of factual assertions that can only be fairly described as shocking and which, for purposes of this motion, we must adopt as true.[1]  The majority concludes that even if these allegations and other equally disturbing ones are true, no court may even consider whether the education being provided to the children of Highland Park fails to meet constitutional and statutory requirements.

A few of the more disturbing accusations are as follows:

- There are 973 students enrolled in the HPSD;
- 65% of fourth grade students tested below "proficient" on the Michigan Educational Assessment Program (MEAP) Reading test and 87% scored below "proficient" on the MEAP math test;[2]
- 75% of seventh grade students scored below "proficient" on the MEAP Reading test and 93% scored below "proficient" on the MEAP Math test;
- At the high school level, 90% of students failed the Michigan Merit Examination[3] Reading test; 97% failed the Math test; 94% failed the Writing test; 100% failed the Social Studies test; 100% failed the Science test;
- A lack of textbooks exists such that students are rarely able to take home textbooks;
- Many classrooms have inadequate heat or no heat at all;
- School buildings are unsecured such that a homeless man was able to live and sleep in the facilities without detection by school officials;
- Student files do not contain assessments of grade level performance, current and post MEAP assessment, counseling records, attendance records, or discipline records;
- By contrast, in the demographically similar school district of Inkster, 98% of students met reading and math standards on the 2010 MEAP.

---

[1] *Waltz v Wyse*, 469 Mich 642, 647-648; 677 NW2d 813 (2004) (citation omitted) ("In determining whether summary disposition was properly granted under MCR 2.116(C)(7), this Court consider[s] all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them.").  In addition, defendants do not, at least for purposes of this motion, dispute the accuracy of plaintiffs' factual allegations.

[2] Student performance on the MEAP is calculated to fall in one of four categories: "advanced," "proficient," "partially proficient," and "not proficient."

[3] This is the final standardized test administered to Michigan students.

Failing to reference these, or any of the other equally disturbing allegations in plaintiffs' complaint, the majority reaches the following conclusions: (1) the provision in the Michigan Constitution that guarantees that every school district "shall provide for the education of pupils," Const 1963, art 8, § 2, has neither meaning nor effect and that no level of failure by a school district to provide these requirements can ever constitute a violation of this provision; (2) the Michigan Constitution's provisions in Article 8, Sections 1 and 2 that the state shall "support and maintain" a system of public schools and that "the means of education shall forever be encouraged," are merely "aspirational" and have no force of law; (3) that no child, parent, or citizen has the authority to seek judicial enforcement of the statutory mandate contained within MCL 380.1278(8) that non-special education students whose reading level is below grade level "shall be provided special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months."

All of these conclusions are erroneous.

## II. CONSTITUTIONAL CLAIMS

Plaintiffs' constitutional claims arise solely under the education provisions of the 1963 Michigan Constitution. Specifically, plaintiffs' complaint alleges that defendants have violated Const 1963, art 8, §§ 1 and 2, which respectively provide:

> Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and *the means of education shall forever be encouraged.*

> The legislature *shall maintain and support a system of free public elementary and secondary schools* as defined by law. *Every school district shall provide for the education of its pupils* without discrimination as to religion, creed, race, color or national origin.

[Emphasis added.]

By virtue of their employment of the word "shall," these constitutional provisions are mandatory and require compliance. See *Port Huron v Amoco Oil, Inc*, 229 Mich App 616, 631; 583 NW2d 215 (1998) (It is a well-established rule of statutory interpretation that "[w]hile the word 'shall' is generally used to designate a mandatory provision, 'may' designates discretion."). Nonetheless, the majority dispenses with these constitutional provisions in conclusory fashion with little, if any, analysis or consideration of the law. Its analysis falters at the very first step, by relying on the fact that education is not a "fundamental interest" under the equal protection clause. See *Martin Luther King Jr Elementary Sch Children v Mich Bd of Ed*, 451 F Supp 1324, 1328 (ED Mich, 1978) ("*MLK*").[4] While plaintiffs did assert an equal protection claim under

---

[4] In this regard, defendants and the majority rely heavily on *MLK*, 451 F Supp 1324, a single federal trial court opinion from 1978. The bulk of *MLK* involved the application of the federal equal protection clause, a claim not raised in this case. *Id*. at 1327-1333. *MLK* did briefly address a claim made under Const 1963, art 8, § 2, concluding that it did not guarantee "equal"

Const 1963, art 1, § 2 before the trial court, that claim is not before this Court in the instant appeal, rendering the majority's discussion of equal protection a red herring.[5] The sole issue is whether the plaintiffs have stated a claim that our constitution's educational provisions have been violated.

The balance of the majority's consideration of § 1 is limited to a single conclusory sentence reading: "Article 8, § 1 merely 'encourage[s]' education, but does not mandate it." The majority opinion wholly fails to address the considerable body of law in this state and sister states addressing the scope and import of such a constitutional provision.

As for § 2, the majority ignores the use of the mandatory word "shall" in both its first and second sentences, applying to the legislature and the relevant school district respectively.[6] In so doing, the majority revises the Constitution's language so as to conclude that § 2 can never be violated. In the majority's view, there are no minimal requirements to "maintain and support." Moreover, a school district could provide nothing more than a building for students to sit in but remain in compliance with this constitutional provision, because, in the words of the majority, the Constitution leaves to the district "the actual intricacies pertaining to the delivery of specific educational services." I might agree with that sentiment if the issue in this case was merely the "intricacies" of the delivery of educational services. However, that is not the situation before us. Indeed, I do not believe that any reasonable person, and certainly no reasonable parent, would conclude that "intricacies" are at issue where, at the HPSD's high school, 90% of students failed the Michigan Merit Reading Examination, 97% failed the Math test, 100% failed the Social Studies test, and 100% failed the Science test. The message the majority sends is that the mandatory constitutional provision that a school district "shall" provide education is met simply

---

education to all students. *Id*. at 1333-1334. It certainly did not define the scope of Const 1963, art 8, § 2, and, of course, we are not bound by lower court federal opinions. *Abela v General Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004).

[5] Moreover, even if plaintiffs' equal protection claim was before this Court, the fact that education has been held not to be a "fundamental interest" does not, in itself, defeat that claim. See, e.g., *Frame v Nehls*, 452 Mich 171, 183; 550 NW2d 739 (1996) ("Unless the [alleged] discrimination impinges on the exercise of a fundamental right or involves a suspect class, the inquiry under the Equal Protection Clause is whether the classification is rationally related to a legitimate governmental purpose.").

[6] In *Feaster v Portage Pub Schs*, 451 Mich 351, 357; 547 NW2d 328 (1996), the Supreme Court unanimously reversed the dismissal of a complaint for declaratory and injunctive relief against a school district based on statutory and constitutional grounds. The Court emphasized that the statutory employment of the word "shall" in directing action by a school district defeated the district's claims that the plaintiff's requested relief went beyond that provided by the constitution. *Id*. at 365. It noted the longstanding policy that school laws are "to be liberally construed consistent with the public policy of fostering and encouraging free public education[.]" *Id*. at 357 (citation omitted).

by its existence, regardless of whether a single student receives any semblance of an actual education.

Contrary to the majority in this case, Michigan courts have been willing to address such questions in the past. In *Bond v Ann Arbor Pub Sch Dist*, 383 Mich 693, 698-697; 178 NW2d 484 (1970), the plaintiffs attended free public schools, i.e., no tuition was charged. The plaintiffs nevertheless argued that the modest fee charged by the defendant school district for books and supplies violated the constitutional requirement that the legislature "maintain and support a system of free public elementary and secondary schools." *Id*. at 697; Const 1963, art 8, § 2. The trial court dismissed the case for failure to state a claim and the Court of Appeals affirmed. *Bond v Ann Arbor Pub Sch Dist*, 18 Mich App 506, 511; 171 NW2d 557 (1969).

Our Supreme Court unanimously reversed. *Bond*, 383 Mich at 706. It held that "free . . . public schools" included the free provision of the "necessary elements of any school's activity," alternatively stated as the materials that "are an essential part of a system of free public elementary and secondary schools." *Id*. at 702. Most important for purposes of the instant appeal is the Court's statement that, "No education of any value is possible without school books." *Id*, quoting *Crowley v Bressler*, 41 NYS 2d 441, 445-446; 181 Misc 59 (1943). The *Bond* Court's analysis makes clear that where public educational services fall below some minimal level, Const 1963, art 8, § 2 has been violated. Where the education provided, like one without textbooks, is not "of any value," the state has not met its constitutional obligation.[7]

In *Snyder v Charlotte Pub Sch Dist*, 421 Mich 517; 365 NW2d 151 (1984), our Supreme Court stated in more general terms:

> Although public education is not a fundamental right granted by the federal constitution, *it is not merely some governmental benefit which is indistinguishable from other forms of social welfare legislation. Plyer v Doe*, 457 US 202, 221; 102 S Ct 2382; 72 L Ed 2d 786 (1982). See also *San Antonio Independent School Dist v Rodriguez*, 411 US 1, 30; 93 S Ct 1278; 36 L Ed 2d 16 (1973). *"[E]ducation is perhaps the most important function of state and local governments." Brown v Topeka Bd of Ed*, 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954). [*Snyder*, 421 Mich at 525 (emphasis added).]

The majority quotes the concurrence in *Milliken v Green*, 390 Mich 389, 406; 212 NW2d 711 (1973) (KAVANAGH and LEVIN, JJ., concurring), for the proposition that "no system of public schools can provide equality of educational opportunity in all its diverse dimensions[,]" but gives no credence to the sentence immediately following, which provides: *"All that can properly be expected of the state is that it maintain and support a system of public schools that furnishes adequate education services to all children."* (Emphasis added). While there is no constitutional requirement that schools provide an optimal education nor that all services be

---

[7] Even if *Bond* were read to apply to nothing outside of the provision of textbooks, it is still applicable to this case as plaintiffs' complaint alleges that "[t]here is a critical lack of textbooks in most classrooms."

provided with perfect equality, for the educational provisions of our constitution to have any meaning, schools must provide "adequate educational services to all children." *Id*.

Moreover, in *Milliken*, which concerned a challenge to Michigan's entire system of public school funding, *id*. at 391, the concurrence stated:

> We are presented with generalized arguments concerning the nature of educational opportunity in this State. So that our opinion not be misconstrued, it is important to note that we are not presented with a concrete claim by either individual students or by school districts that they are suffering from particular specified education inadequacies because of deficiencies . . . . Such concrete claims, when and if raised, will stand or fall on their own merits and not on account of anything we say here. In short, *we are not abandoning the school children of this State to legislative whim in derogation of any judicially enforceable right to an education they may have under our Constitution.* [*Milliken*, 390 Mich at 392-393 (emphasis added).]

In this case, the plaintiff schoolchildren have asked the courts to make good on this commitment not to abandon them. Unlike *Milliken*, this case is not one based on "generalized arguments" about educational opportunity, but rather on objective tests that support the allegation that the overwhelming majority of students in this district are not receiving a minimally adequate education. Ironically, in *Milliken*, the defendant argued that the proper way to demonstrate denial of a constitutionally required education would be to evaluate the school "in terms of 'output,' as measured by pupil accomplishment on certain achievement tests." *Id*. at 398. This is precisely what the instant plaintiffs have done and the testing administered by state law is their best evidence.

Plaintiffs also cite to several cases from our sister states that have considered this question and provided helpful analyses.[8] A review of these cases demonstrates that my colleagues stand nearly alone in their conclusions.

The South Carolina Supreme Court, in *Abbeville Co Sch Dist v State*, 335 SC 58, 63-64; 515 SE2d 535 (1999), considered whether the state's public school funding scheme violated either the equal protection clause or the state constitution's education clause. It found no equal protection violation, *id*. at 65, but concluded that the funding scheme violated the state constitution, *id*. at 68. The relevant clause closely resembles Const 1963, art 8, § 2, and provides:

---

[8] The concurrence rejects some of these cases as "not analogous" because they deal with school funding issues rather than minimal educational quality. I do not see why such a distinction renders those cases irrelevant to our instant inquiry. If anything, courts should be more hesitant to review broad funding mechanisms than a particular failure to provide minimal educational services in a single school district.

The General Assembly shall provide for the maintenance and support of a system of free public schools open to all children in the state and shall establish, organize and support such other public institutions of learning as may be desirable. [*Abbeville Co*, 335 SC at 66.]

The trial court in *Abbeville* had concluded that the language of the provision was non-specific and that "judicial restraint, separation of powers, and/or the political question doctrine prevented it from considering this education clause claim." *Id*. at 67. The South Carolina Supreme Court reversed that holding, ruling that the constitutional mandate required the state to "provide opportunity for each child to receive a minimally adequate education[,]" which it defined as: "1) the ability to read, write, and speak the English language, and knowledge of mathematics and physical science; 2) a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and 3) academic and vocational skills." *Id*. at 68. The court went on to state:

We recognize that we are not experts in education, and we do not intend to dictate the programs utilized in our public schools. Instead, we have defined, within deliberately broad parameters, the outlines of the constitution's requirement of minimally adequate education.

Finally, we emphasize that the constitutional duty to ensure the provision of minimally adequate education to each student in South Carolina rests on the legislative branch of government. We do not intend by this opinion to suggest to any party that we will usurp the authority of that branch to determine the way in which educational opportunities are delivered to the children of our State. We do not intend the courts of this State to become super-legislatures or super-school boards. [*Id*. at 69.]

This holding is consistent with the application of other states' constitutional provisions similar to Const 1963, art 8, § 2.

In *Lake View Sch Dist No. 25 of Phillips Co v Huckabee*, 351 Ark 31; 91 SW3d 472 (2002), the Arkansas Supreme Court held that the legislative and executive branches were in violation of the state's constitutional education provision. *Id*. at 52-53; see Ark Const, art 14, § 1. In rejecting a justiciability argument similar to that made in the instant case, the court noted that, "The State's argument appears to be that not only are legislative acts presumed to be constitutional, but that they are *per se* constitutional and not subject to judicial review." *Id*. at 53 (citation omitted).

The high court of New York State, the Court of Appeals, reached the same conclusion. In *Campaign for Fiscal Equity v New York*, 86 NY2d 307; 655 NE2d 661 (1995), that court interpreted New York's constitutional education provision, which is nearly identical to Michigan's and mandates that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." *Id*. at 314. The court held that this provision "requires the State to offer all children the opportunity of a sound basic education . . . . Such an education should consist of the basic literary, calculating,

and verbal skills necessary to enable children to eventually function productively as civic participants . . . ." *Id*. at 316.

In *Claremont Sch Dist v Governor*, 142 NH 462; 703 A2d 1353 (1997), the New Hampshire Supreme Court, relying on a constitutional education clause even less specific than Michigan's,[9] held that "[o]ur society places tremendous value on education. Education provides the key to individual opportunities for social and economic advancement and forms the foundation for our democratic institutions and our place in the global economy." *Id*. at 472. The court went on to enumerate several "benchmarks of a constitutionally adequate public education" and left it to the legislature to meet those benchmarks. *Id*. at 474-476.

In Tennessee, the state constitutional education clause contains language resembling Michigan's, providing:

> The State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such postsecondary educational institutions, including public institutions of higher learning, as it determines. [Tenn Const, art XI, § 12.]

Relying on dictionary definitions of the word "education," the Tennessee Supreme Court held that the clause required "that the General Assembly shall maintain and support a system of free public schools that provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare students intellectually for a mature life." *Tenn Small Sch Sys v McWherter*, 851 SW2d 139, 150-151 (Tenn, 1993).

Similarly, in *Rose v Council for Better Ed, Inc*, 790 SW2d 186 (Ky, 1989), the Kentucky Supreme Court addressed the Kentucky constitutional provision requiring that "The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." Ky Const, § 183. The court found the question justiciable and determined the school system constitutionally deficient:

> [W]e [do not] intend to substitute our judicial authority for the authority and discretion of the General Assembly. We are, rather, exercising our constitutional duty in declaring that, when we consider the evidence in the record, and when we apply the constitutional requirement of Section 183 to that evidence, it is crystal clear that the General Assembly has fallen short of its duty to enact legislation to provide for an efficient system of common schools throughout the state. In a word, the present system of common schools in Kentucky is not an "efficient" one in our view of the clear mandate of Section 183. The common school system in Kentucky is constitutionally deficient. [*Rose*, 790 SW2d at 189.]

---

[9] See NH Const, part II, art LXXXIII.

In *Pauley v Kelly*, 162 W Va 672, 689; 255 SE2d 859 (1979), the West Virginia Supreme Court of Appeals held that their constitution required the state to prepare students for useful occupations and citizenship including literacy and the "ability to add, subtract, multiply and divide numbers[.]" *Id.* at 705-706.

In *Seattle Sch Dist No. 1 of King Co v State*, 90 Wash 2d 476; 585 P2d 71 (1978), the Washington Supreme Court interpreted that state's constitutional education clause, which provides that "[i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders[.]" Wash Const, art IX, § 1. The court held that, under this clause, "the State's constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces board educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the market place of ideas." *Seattle Sch Dist No. 1*, 90 Wash 2d at 517. The court explained that, "[t]he constitutional right to have the State 'make ample provision for the education of all (resident) children' would be hollow indeed if the possessor of the right could not compete adequately in our open political system, in the labor market, or in the market place of ideas." *Id.* at 518.

Given these holdings from our sister states, which favor plaintiffs, it is difficult to see why the majority finds judicial overreach in addressing whether our constitution's education provision is violated when the overwhelming majority of students in the subject district cannot read or perform mathematics at grade level.

Defendants rely heavily on *King v Iowa*, 818 NW2d 1 (Iowa, 2012). However, the Iowa constitutional education clause bears little resemblance to Michigan's. To recall, the relevant clauses of our constitution, Const 1963, art 8, §§ 1 and 2, provide:

> Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.

The relevant clause of the Iowa constitution, by contrast, does not even contain the word "education." It reads in relevant part: "The General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement." *King*, 818 NW2d at 12.[10]

---

[10] For this reason, *King* undercuts the concurrence's conclusion that to hear plaintiffs claim under Const 1963, art 8, § 2, the judiciary must impermissibly "read into" the Constitution words such

-10-

In *King*, the Iowa high court referenced its state's unusual history of rejecting any constitutional provisions to mandate free public schools, noting that as far back as 1859 "we reached the conclusion that no aspect of the Iowa Constitution, including the education clause, authorized the legislature to provide for public schools" and that its constitutional convention had voted down a proposed amendment to provide for tuition-free schools. *Id*. at 14-15. Based on this rather particular constitutional history, the *King* court concluded that if the Iowa constitution "did not assure a right to a free public education, it seems untenable to argue that [it] contained a judicially enforceable right to a free public education with certain minimum standards of quality." *Id*. (emphasis omitted).

Michigan's constitutional education clause reads very differently that Iowa's. And, the other states that have addressed this question have consistently held that a cause of action may be brought, argued, and that a court may find that the state has failed to satisfy the education clause of the state's constitution due to a failure to provide some baseline level of adequacy of education.[11]

## III. STATUTORY CLAIMS

The majority's rejection of plaintiffs' statutory claims against the school district defendants is even more difficult to understand. MCL 380.1278(8), part of the School Code, provides:

> Excluding special education pupils, pupils having a learning disability, and pupils with extenuating circumstances as determined by school officials, a pupil who does not score satisfactorily on the 4th or 7th grade Michigan

---

as "sufficient," "adequate," or "quality" with regard to the education required to be provided to Michigan's children. While I agree that it is not the province of the judiciary to add words to the provisions of the Michigan Constitution, I suggest that it is my colleagues who seek to do so by adding the words "with no minimal standards of quality" to the requirement that the state and school districts provide "education." The word "education" means "the process of training and developing the knowledge, skill, mind, character, etc., especially by formal schooling; teaching; training" *Webster's New Twentieth Century Dictionary* (2d ed), and plaintiffs assert that a constitutionally satisfactory "education" has not been provided. In addition, Const 1963, art 8, § 2 requires that the legislature maintain and support a system of public education "as defined by law" and plaintiffs have alleged that in the HPSD, the public education is in violation of state statute MCL 380.1278(8). Also, given that the concurrence concedes that "no sane individual would oppose the proposition that Michigan schools should provide a quality education for all[,]" it is difficult to conclude that providing an "adequate" education was not the intent of the framers and voters in adopting these constitutional provisions.

[11] Moreover, like in *Haridopolos v Citizens for Strong Schs, Inc*, 81 So 3d 465, 472 (Fla Ct App, 2011), "[t]he present case is, to be sure, distinguishable from *King*, which featured an attack on internal legislative processes[.]" There is also no such attack made in the instant case. *Haridopolos* also concluded that even if the imposition of a remedy was beyond the court's role, the court, at minimum, had jurisdiction to enter a declaratory judgment. *Id*. at 473.

-11-

educational assessment program [MEAP] reading test *shall be provided* special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months. [Emphasis added.]

Like the previously discussed constitutional provisions, this statute employs the word "shall," denoting required compliance on the part of subject school district. See *Port Huron*, 229 Mich App at 631. Defendants do not appear to dispute that a majority of the relevant fourth grade non-special education students did not score satisfactorily on the reading test or that an overwhelming majority of seventh grade students failed to do so as well. Thus, the district essentially concedes that it has violated the plain terms of the statute.

The majority nevertheless reverses the trial court's denial of defendant's motion for summary disposition, concluding that "it remains to be determined whether the [individual plaintiffs] are subject to exclusion from additional instruction premised on 'extenuating circumstances as determined by school officials.'" The fact that this issue "remains to be determined" is grounds for affirming the trial court's denial of summary disposition, not for reversing it. Moreover, defendants have not alleged or offered any evidence that the students fall within the exception for "pupils with extenuating circumstances as determined by school officials."

The majority also states that, "While the form of additional instruction may be deemed insufficient given the lack of progress in developing reading proficiency for these students, this would constitute a separate and distinct claim." It offers no basis for this statement, likely because there is none. Essentially, the majority states that if the services provided to these students are inadequate, it constitutes a "separate and distinct claim." In fact, that is exactly the letter and spirit of the claim now before us. To direct these minor plaintiffs, who have litigated these cases for over two years and are, therefore, two years closer to "graduation," to start over with a new case, premised on defendants' failure to remedy their educational shortcomings, mocks these children.

The majority further concludes that MCL 380.1278(8) does not provide a private cause of action. For this principle, it cites only *Lash v Traverse City*, 479 Mich 180, 194; 735 NW2d 628 (2007), but does not reference that case's reasoning. Rather, the majority implies that *Lash* held that, in the absence of an express statutory authorization of a private cause of action, no statute can ever give rise to a private cause of action. This is simply false. In *Lash*, our Supreme Court held that

when a statute is silent concerning whether a private remedy is available for a statutory violation, a court may infer a private cause of action "if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision . . . ." [*Lash*, 479 Mich at 192, quoting *Gardner v Wood*, 429 Mich 290, 301 n 5; 414 NW2d 706 (1987), quoting 4 Restatement Torts, 2d, § 874A, p 301.]

That is,

> a cause of action could be created to redress a statutory violation where the purpose of the statute at issue was found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results. [*Lash*, 479 Mich at 192-193 (quotation marks, formatting, and citations omitted).]

All of these requirements are plainly met in this case. MCL 380.1278(8) explicitly defines the class of persons intended to be protected as "[non-special education] pupils who do not score satisfactorily on the 4th or 7th grade [MEAP] . . . reading test." The particular interest is obtaining a minimum level of education that will enable these children to become functioning members of society. The kind of harm is the denial of the "special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months." The hazard is the failure to provide that assistance.

The majority's willingness to ignore the statute is particularly odd given the majority's repeated assertion that education policy is a matter for the legislature. In enacting MCL 380.1278(8), the legislature set education policy. It is merely a question of whether that policy, and the statute enacting it, will be enforced by the courts. The majority wrongly declines to do so.

## IV. AVAILABLE RELIEF

In large measure, my colleagues base their dismissal of this case on the grounds that if plaintiffs were to prevail at trial on either their statutory or constitutional claims, relief may not be easily fashioned and that some forms of relief may constitute an overextension of judicial authority. In my view, there is no basis for this concern as to plaintiffs' statutory claim and any such concern as to the constitutional claims is both premature and exaggerated.

As to the statutory claim, if plaintiffs were to prevail at trial, the remedy would be straightforward. Defendants would be ordered to provide the service that is specifically defined in MCL 380.1278(8). Moreover, contrary to defendant's argument, a writ of mandamus would be available to so direct. The statute, using the word "shall" imposes a duty on the district to provide assistance to the relevant students. I agree that the precise nature of that assistance is left to the discretion of the district, but "the writ will lie to require a body or an officer charged with a duty to take action in the matter, notwithstanding the fact that the execution of that duty may involve some measure of discretion." *Teasel v Dep't of Mental Health*, 419 Mich 390, 410; 355

NW2d 75 (1984). As defendants have acknowledged in their briefs, "mandamus will lie to compel the exercise of discretion, but not to compel its exercise in a particular manner." *Id.*[12]

Moreover, like in *Teasel*, where the relevant statute required not merely any psychiatric evaluation, but an *informed* one, 419 Mich at 401; MCL 330.1476, the statute at issue in this case, MCL 380.1278(8), mandates a standard for the "special assistance" that must be provided, namely that the assistance must be "reasonably expected" to fulfill the statutory goal of bringing students to grade reading level within 12 months. As our Supreme Court has repeatedly held, "reasonably expected" is a term of art that denotes an objective standard. See *Krohn v Home-Owners Ins Co*, 490 Mich 145, 163; 802 NW2d 281 (2011); *Allstate Ins Co v McCarn*, 471 Mich 283, 290; 683 NW2d 656 (2004). Indeed, in other instances that called for a "reasonableness" determination, the Supreme Court found mandamus an appropriate remedy. See, e.g. *Hering v Royal Oak*, 326 Mich 232, 237; 40 NW2d 133 (1949); *Employees & Judges of Second Judicial Dist Ct v Hillsdale Co*, 423 Mich 705, 702; 378 NW2d 744 (1984).

Defendants essentially argue that they are above the law. They claim to possess the authority to violate a statutory mandate and that no action may be taken in the courts to enforce that statute. This is precisely the situation that Justice Ryan cautioned against in *Teasel*:

> The [mandamus] power [of the judiciary] is not one to create a duty where none existed before or to mandate action where the decision whether to act is discretionary. Rather, the power is the constitutional power of a circuit court to direct, upon complaint of an aggrieved party, that a duty imposed by law upon the executive department of the government to make a decision according to legislatively established criteria be carried out. Were it otherwise, our citizens would be powerless to compel their public servants to conduct the business of government—to make a decision, whether good or bad, but some decision, based upon the legislatively established criteria where the duty to make a decision is clear. [*Teasel*, 419 Mich at 412.]

In this case, plaintiffs allege that defendants have violated a statutory mandate, i.e., that they "shall" provide "special assistance" to students that fail the fourth or seventh grade MEAP reading test. While the precise nature of that required assistance remains discretionary, the government entity may not use that discretion as an excuse to simply take no action at all. In other words, a government entity may not wholly avoid compliance with a statutory mandate on the grounds that it retains some discretion as to the particular method of compliance.

---

[12] In *Teasel*, the plaintiff moved the court for a return to a state mental hospital, arguing that he was entitled to treatment and had been dismissed without the statutorily-required evaluation. *Teasel*, 419 Mich at 397-398. Writing for a unanimous Court, Justice Ryan clearly articulated the scope of mandamus in a case such as that before us. He explained that while the ultimate action chosen by a governmental agent or entity may remain discretionary and, therefore, beyond mandamus, a court does possess jurisdiction to direct that governmental agent or entity to exercise its discretion and to do so in accordance with the applicable statutory standards. *Id.* at 414-416.

I agree with my colleagues that defining a judicial remedy for the constitutional claim, should it be shown to be meritorious, may pose challenges. However, it is likely that a judicially crafted remedy would not be necessary. The parties may, and I believe likely would, design a remedy to which they can agree. If that does not occur, the question of remedy can be referred to the legislative branch for first consideration. Many state courts that have ruled in favor of plaintiffs in claims like the one now before us have declared the status quo unconstitutional and, rather than attempting to define what must be done, have simply directed the legislative or executive branch to adopt remedial action of their own choice and design. See *Claremont Sch Dist v Governor*, 143 NH 154, 158; 725 A2d 648 (1998); *Sheff v O'Neill*, 238 Conn 1, 3-4; 678 A2d 1267 (1996) (court granted plaintiffs' request for declaratory relief but stayed imposition of any judicially crafted remedy to afford the legislature an opportunity to act); *Bingham v Vermont*, 166 Vt 246, 269; 692 A2d 384 (1997) (declaratory relief granted; jurisdiction retained until remedial legislation could be enacted); *McDuffy v Secretary of Executive Office of Edu*, 415 Mass 545; 614 NE2d 516 (1993); *Rose*, 790 SW2d at 215-216 (holding that the legislature failed to fulfill constitutional duties to provide for an efficient system of public schools, but withholding finality of the decision until 90 days after the adjournment of the legislative session).[13]

Most important, I reject the majority's view that the possibility that such challenges might be faced if and when plaintiffs prove their case is grounds to not hear their case at all. It is the very rare case in which the judiciary is able to impose a perfect remedy: the issuance of a personal protection order does not automatically insulate an individual from further harassment, the imprisonment of a convicted murderer does not bring the victim back to the life or heal her loved ones, and civil judgments often fail to make the prevailing party whole. In sum, the role of the court is to determine the rights of the parties under the rule of law and, based on that determination, fashion a reasonable, albeit often imperfect, remedy in cases where the parties cannot agree upon one. In that respect, this case is no different than many others that come before our courts.

---

[13] My colleagues suggest that the only available solution for these children is "political," i.e., for the voters of Highland Park to elect a "better" school board. However, as the discussed cases demonstrate, even if the question of remedy is later found to exceed judicial capabilities, it is well within the purview of the judiciary to declare the status quo unlawful and refer the determination of remedy to the political branches.

At minimum, it is clear that a declaratory judgment[14] finding that the status quo is in violation of Const 1963, art 8, §§ 1-2 and/or MCL 380.1278(8), or an injunction directing compliance with those laws, is well within the judiciary's purview. Indeed, such action, if merited, is required by our constitutional role as a check and balance on the other branches. As Justice Hugo Black observed: "[T]he judiciary was made independent because it has . . . the primary responsibility and duty of giving force and effect to constitutional liberties and limitations upon the executive and legislative branches." Black, *The Bill of Rights*, 35 NYU L Rev 865, 870 (1960).

## V. CONCLUSION

My colleagues offer kindly worded sympathy to the children whose futures are in jeopardy through no fault of their own. But, the schoolchildren who brought this claim are not requesting this Court's sympathy. They are asking that we allow their case to be heard.

The ultimate resolution of this case, if allowed to be heard, cannot now be known. Defendants may prevail on the merits. The parties may agree on a remedy or, after trial, the trial court may impose a remedy from which none of the parties appeals. Whether a remedy is imposed and, if so, whether it is proper, is a question that we should not, and may not, determine at this stage of the case. Most important, the mere existence of that question should not lead us to refuse to hear the case altogether.

I wish to stress that I do not assert that this Court should now conclude whether the state and school district are in violation of either statutory or constitutional standards. However, I do assert, consistent with precedent, that this is a justiciable matter, states a claim, and that a trial court, after hearing the relevant proofs, may render a decision subject to appellate review.

Accordingly, I respectfully dissent.

/s/ Douglas B. Shapiro

---

[14] The majority opinion fails to substantively discuss plaintiffs' request for declaratory relief despite the fact that the trial court declined to dismiss that claim and the complaint and amended complaint each request that "this Court . . . [d]eclare as unconstitutional Defendants' violation of Plaintiffs' rights as pursuant to MCL 380.1278(8) . . . [and] declare as unconstitutional Defendants' violation of Plaintiffs' rights under Article 8, Sections 1 and 2 of the Michigan Constitution; [and] declare as unconstitutional Defendants' violations of Plaintiffs' rights under Article 1, Section 2 of the Michigan Constitution." I believe the majority's cursory treatment of this claim insufficient to support its summary dismissal.